JACKSONVILLE BULK TERMINALS, INC., ET AL. *v.*
INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION ET AL.

No. 80–1045.   Argued January 18, 1982—Decided June 24, 1982

MARSHALL, J., delivered the opinion of the Court, in which BRENNAN, WHITE, BLACKMUN, and REHNQUIST, JJ., joined. O'CONNOR, J., filed an opinion concurring in the judgment, *post*, p. 724. BURGER, C. J., filed a dissenting opinion, in which POWELL, J., joined, *post*, p. 724. POWELL, J., *post*, p. 729, and STEVENS, J., *post*, p. 730, filed dissenting opinions.

*Thomas P. Gies* argued the cause for petitioners. With him on the briefs were *Andrew M. Kramer, Zachary D. Fasman,* and *Kenneth A. McGaw.*

*Ernest L. Mathews, Jr.*, argued the cause for respondents. With him on the brief were *Thomas W. Gleason* and *Charles R. Goldburg.**

JUSTICE MARSHALL delivered the opinion of the Court.

In this case, we consider the power of a federal court to enjoin a politically motivated work stoppage in an action brought by an employer pursuant to § 301(a) of the Labor Management Relations Act (LMRA), 61 Stat. 156, 29 U. S. C. § 185(a), to enforce a union's obligations under a collective-bargaining agreement. We first address whether the broad anti-injunction provisions of the Norris-La Guardia Act, 47 Stat. 70, 29 U. S. C. § 101 *et seq.*, apply to politically motivated work stoppages. Finding these provisions applicable, we then consider whether the work stoppage may be enjoined under the rationale of *Boys Markets, Inc.* v. *Retail Clerks*, 398 U. S. 235 (1970), and *Buffalo Forge Co.* v. *Steelworkers*, 428 U. S. 397 (1976), pending an arbitrator's decision on whether the strike violates the collective-bargaining agreement.

I

On January 4, 1980, President Carter announced that, due to the Soviet Union's intervention in Afghanistan, certain trade with the Soviet Union would be restricted. Superphosphoric acid (SPA), used in agricultural fertilizer, was not included in the Presidential embargo.[1] On January 9, 1980,

---

*Solicitor General McCree, Acting Assistant Attorney General Schiffer, Elinor Hadley Stillman,* and *Anthony J. Steinmeyer* filed a brief for the United States as *amicus curiae* urging reversal.

*J. Albert Woll, Marsha S. Berzon,* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging affirmance.

[1] On February 25, 1980, the embargo was extended to include SPA along with other products. On April 24, 1981, President Reagan lifted the SPA embargo as part of his decision to remove restrictions on the sale of grain to the Soviets. By telegrams dated April 24, 1981, and June 5, 1981, the International Longshoremen's Association recommended to its members that they resume handling goods to

respondent International Longshoremen's Association (ILA) announced that its members would not handle any cargo bound to, or coming from, the Soviet Union or carried on Russian ships.[2] In accordance with this resolution, respondent local union, an ILA affiliate, refused to load SPA bound for the Soviet Union aboard three ships that arrived at the shipping terminal operated by petitioner Jacksonville Bulk Terminals, Inc. (JBT), at the Port of Jacksonville, Fla., during the month of January 1980.

In response to this work stoppage, petitioners JBT, Hooker Chemical Corp., and Occidental Petroleum Co. (collectively referred to as the Employer)[3] brought this ac-

---

and from the Soviet Union. Although the work stoppage is no longer in effect, there remains a live controversy over whether the collective-bargaining agreement prohibits politically motivated work stoppages, and the Union may resume such a work stoppage at any time. As a result, this case is not moot. See *Buffalo Forge Co.* v. *Steelworkers*, 428 U. S. 397, 403, n. 8 (1976).

[2] The President of the ILA made the following announcement:

"In response to overwhelming demands by the rank and file members of the Union, the leadership of the ILA today ordered immediate suspension in handling all Russian ships and all Russian cargoes in ports from Maine to Texas and Puerto Rico where ILA workers are employed.

.        .        .        .        .

"The reason for this action should be apparent in light of international events that have affected relations between the U. S. & Soviet Union.

"However, the decision by the Union leadership was made necessary by the demands of the workers.

"It is their will to refuse to work Russian vessels and Russian cargoes under present conditions of the world.

"People are upset and they refuse to continue the business as usual policy as long as the Russians insist on being international bully boys. It is a decision in which the Union leadership concurs." Brief for Respondents 2, n. 2.

[3] JBT is a wholly owned subsidiary of Oxy Chemical Corp., which is a subsidiary of Hooker. Ownership of all these corporations is ultimately vested in Occidental. Hooker Chemical Co. manufactures SPA at a manufacturing facility in Florida. Pursuant to a bilateral trade agreement between Occidental and the Soviet Union, SPA is shipped to the Soviet Union from the JBT facility in Jacksonville.

tion pursuant to § 301(a) of the LMRA, 29 U. S. C. § 185(a), against respondents ILA, its affiliated local union, and its officers and agents (collectively referred to as the Union). The Employer alleged that the Union's work stoppage violated the collective-bargaining agreement between the Union and JBT. The Employer sought to compel arbitration under the agreement, requested a temporary restraining order and a preliminary injunction pending arbitration, and sought damages.

The agreement contains both a broad no-strike clause and a provision requiring the resolution of all disputes through a grievance procedure, ending in arbitration.[4] The no-strike clause provides:

> "During the term of this Agreement, . . . the Union agrees there shall not be any strike of any kind or degree whatsoever, . . . for any cause whatsoever; such causes including but not limited to, unfair labor practices by the Employer or violation of this Agreement. The right of employees not to cross a bona fide picket line is recognized by the Employer. . . ."

The United States District Court for the Middle District of Florida ordered the Union to process its grievance in accordance with the contractual grievance procedure. The District Court also granted the Employer's request for a preliminary injunction pending arbitration, reasoning that the political

---

[4] The grievance and arbitration clause provides in relevant part:

"Matters under dispute which cannot be promptly settled between the Local and an individual Employer shall . . . be referred . . . to a Port Grievance Committee . . . . In the event this Port Grievance Committee cannot reach an agreement . . . the dispute shall be referred to the Joint Negotiating Committee . . . .

. . . . .

"A majority decision of this Committee shall be final and binding on both parties and on all Employers signing this Agreement. In the event the Committee is unable to reach a majority decision within 72 hours after meeting to discuss the case, it shall employ a professional arbitrator . . . ."

motivation behind the work stoppage rendered the Norris-La Guardia Act's anti-injunction provisions inapplicable.

The United States Court of Appeals for. the Fifth Circuit affirmed the District Court's order to the extent it required arbitration of the question whether the work stoppage violated the collective-bargaining agreement. *New Orleans Steamship Assn.* v. *General Longshore Workers*, 626 F. 2d 455 (1980).[5] However, the Court of Appeals disagreed with the District Court's conclusion that the provisions of the Norris-La Guardia Act are inapplicable to politically motivated work stoppages. Relying on *Buffalo Forge*, the Court of Appeals further held that the Employer was not entitled to an injunction pending arbitration because the underlying dispute was not arbitrable. We granted certiorari, 450 U. S. 1029 (1981), and agree with the Court of Appeals that the provisions of the Norris-La Guardia Act apply to this case, and that, under *Buffalo Forge*, an injunction pending arbitration may not issue.

## II

Section 4 of the Norris-La Guardia Act provides in part:

> "No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute . . . from doing, whether singly or in concert, any of the following acts:
>
> "(a) Ceasing or refusing to perform any work or to remain in any relation of employment." 47 Stat. 70, 29 U. S. C. § 104.

---

[5] The Union concedes that the question whether the work stoppage violates the no-strike clause is arbitrable. In a consolidated case, the Court of Appeals upheld an injunction issued by the United States District Court for the Eastern District of Louisiana enforcing an arbitrator's decision that the ILA work stoppage violated a collective-bargaining agreement. 626 F. 2d, at 469.

Congress adopted this broad prohibition to remedy the growing tendency of federal courts to enjoin strikes by narrowly construing the Clayton Act's labor exemption from the Sherman Act's prohibition against conspiracies to restrain trade, see 29 U. S. C. § 52. See, *e. g.*, H. R. Rep. No. 669, 72d Cong., 1st Sess., 7–8, 10–11 (1932). This Court has consistently given the anti-injunction provisions of the Norris-La Guardia Act a broad interpretation, recognizing exceptions only in limited situations where necessary to accommodate the Act to specific federal legislation or paramount congressional policy. See, *e. g.*, *Boys Markets, Inc.* v. *Retail Clerks*, 398 U. S., at 249–253; *Railroad Trainmen* v. *Chicago River & Indiana R. Co.*, 353 U. S. 30, 39–42 (1957).

The *Boys Markets* exception, as refined in *Buffalo Forge Co.* v. *Steelworkers*, 428 U. S. 397 (1976), is relevant to our decision today. In *Boys Markets*, this Court re-examined *Sinclair Refining Co.* v. *Atkinson*, 370 U. S. 195 (1962), which held that the Norris-La Guardia Act precludes a federal district court from enjoining a strike in breach of a collective-bargaining agreement, even where that agreement contains provisions for binding arbitration of the grievance concerning which the strike was called. 398 U. S., at 237–238. The Court overruled *Sinclair* and held that, in order to accommodate the anti-injunction provisions of Norris-La Guardia to the subsequently enacted provisions of § 301(a) and the strong federal policy favoring arbitration, it was essential to recognize an exception to the anti-injunction provisions for cases in which the employer sought to enforce the union's contractual obligation to arbitrate grievances rather than to strike over them. 398 U. S., at 249–253.[6]

After *Boys Markets*, the Courts of Appeals divided on the question whether a strike could be enjoined under the *Boys*

---

[6] In *Boys Markets*, the underlying dispute was clearly subject to the grievance and arbitration procedures of the collective-bargaining agreement, and the strike clearly violated the no-strike clause.

*Markets* exception to the Norris-La Guardia Act pending arbitration, when the strike was not over a grievance that the union had agreed to arbitrate.[7]  In *Buffalo Forge*, the Court resolved this conflict and held that the *Boys Markets* exception does not apply when only the question whether the strike violates the no-strike pledge, and not the dispute that precipitated the strike, is arbitrable under the parties' collective-bargaining agreement.[8]

The Employer argues that the Norris-La Guardia Act does not apply in this case because the political motivation underlying the Union's work stoppage removes this controversy from that Act's definition of a "labor dispute."  Alternatively, the Employer argues that this case fits within the exception to that Act recognized in *Boys Markets* as refined in *Buffalo Forge*.  We review these arguments in turn.

## III

At the outset, we must determine whether this is a "case involving or growing out of any labor dispute" within the meaning of § 4 of the Norris-La Guardia Act, 29 U. S. C. § 104.  Section 13(c) of the Act broadly defines the term "labor dispute" to include "any controversy concerning terms or conditions of employment."  47 Stat. 73, 29 U. S. C. § 113(c).[9]

---

[7] See cases cited in *Buffalo Forge*, 428 U. S., at 404, n. 9.

[8] In *Buffalo Forge*, the strike at issue was a sympathy strike in support of sister unions negotiating with the employer.  The Court reasoned that there was no need to accommodate the policies of the Norris-La Guardia Act to § 301 and to the federal policy favoring arbitration when a strike is not called over an arbitrable dispute, because such a strike does not directly frustrate the arbitration process by denying or evading the union's promise to arbitrate.  428 U. S., at 407–412.

[9] Section 13(c) provides:

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to

The Employer argues that the existence of political motives takes this work stoppage controversy outside the broad scope of this definition. This argument, however, has no basis in the plain statutory language of the Norris-La Guardia Act or in our prior interpretations of that Act. Furthermore, the argument is contradicted by the legislative history of not only the Norris-La Guardia Act but also the 1947 amendments to the National Labor Relations Act (NLRA).

## A

An action brought by an employer against the union representing its employees to enforce a no-strike pledge generally involves two controversies. First, there is the "underlying dispute," which is the event or condition that triggers the work stoppage. This dispute may or may not be political, and it may or may not be arbitrable under the parties' collective-bargaining agreement. Second, there is the parties' dispute over whether the no-strike pledge prohibits the work stoppage at issue. This second dispute can always form the basis for federal-court jurisdiction, because § 301(a) gives federal courts jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization." 29 U. S. C. § 185(a).

It is beyond cavil that the second form of dispute—whether the collective-bargaining agreement either forbids or permits the union to refuse to perform certain work—is a "controversy concerning the terms or conditions of employment." 29 U. S. C. § 113(c). This § 301 action was brought to resolve just such a controversy. In its complaint, the Employer did not seek to enjoin the intervention of the Soviet Union in Afghanistan, nor did it ask the District Court to decide whether the Union was justified in expressing disapproval of the Soviet Union's actions. Instead, the Employer

---

arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

sought to enjoin the Union's decision not to provide labor, a decision which the Employer believed violated the terms of the collective-bargaining agreement. It is this contract dispute, and not the political dispute, that the arbitrator will resolve, and on which the courts are asked to rule.

The language of the Norris-La Guardia Act does not except labor disputes having their genesis in political protests. Nor is there any basis in the statutory language for the argument that the Act requires that *each* dispute relevant to the case be a labor dispute. The Act merely requires that the case involve "any" labor dispute. Therefore, the plain terms of § 4(a) and § 13 of the Norris-La Guardia Act deprive the federal courts of the power to enjoin the Union's work stoppage in this § 301 action, without regard to whether the Union also has a nonlabor dispute with another entity.[10]

The conclusion that this case involves a labor dispute within the meaning of the Norris-La Guardia Act comports with this Court's consistent interpretation of that Act.[11] Our

---

[10] Of course, there are exceptions to the Act's prohibitions against enjoining work stoppages. See, *e. g., Boys Markets, Inc.* v. *Retail Clerks*, 398 U. S. 235 (1970). The employer may obtain an injunction to enforce an arbitrator's decision that the strike violates the collective-bargaining agreement and can recover damages for the violation, pursuant to § 301 of the LMRA, 29 U. S. C. § 185. See, *e. g., Buffalo Forge, supra*, at 405. See also *infra*, at 718–719, and n. 18 (discussing Board's authority under 29 U. S. C. §§ 160(k), 160(*l*), to petition for an injunction upon finding reasonable cause to believe that the strike is an unfair labor practice).

[11] The Employer's reliance on *Eastex, Inc.* v. *NLRB*, 437 U. S. 556 (1978), to argue that a politically motivated strike is not a labor dispute is misplaced. In *Eastex*, we addressed whether certain concerted activity was protected under § 7 of the NLRA, 29 U. S. C. § 157, and we recognized that "[t]here may well be types of conduct or speech that are so purely political or so remotely connected to the concerns of employees as employees as to be beyond the protection of [§ 7]." *Id.*, at 570, n. 20. Although the definition of a "labor dispute" in § 2(9) of the NLRA, 29 U. S. C. § 152(9), is virtually identical to that in § 13(c) of the Norris-La Guardia Act, 29 U. S. C. § 113(c), and the two provisions have been construed consistently with one another, *e. g., United*

decisions have recognized that the term "labor dispute" must not be narrowly construed because the statutory definition itself is extremely broad and because Congress deliberately included a broad definition to overrule judicial decisions that had unduly restricted the Clayton Act's labor exemption from the antitrust laws. For example, in *Marine Cooks & Stewards* v. *Panama S.S. Co.*, 362 U. S. 365, 369 (1960), the Court observed:

> "Th[e] Act's language is broad. The language is broad because *Congress was intent upon taking the federal courts out of the labor injunction business* except in the very limited circumstances left open for federal jurisdiction under the Norris-LaGuardia Act. The history and background that led Congress to take this view have been adverted to in a number of prior opinions of this Court in which we refused to give the Act narrow interpretations that would have restored many labor dispute controversies to the courts" (emphasis added; footnote omitted).

The critical element in determining whether the provisions of the Norris-La Guardia Act apply is whether "the employer-employee relationship [is] the matrix of the contro-

---

*States* v. *Hutcheson*, 312 U. S. 219, 234, n. 4 (1941), this similarity does not advance the Employer's argument. Union activity that prompts a "labor dispute" within the meaning of these sections may be protected by § 7, prohibited by § 8(b), 29 U. S. C. § 158(b), or neither protected nor prohibited. The objective of the concerted activity is relevant in determining whether such activity is protected under § 7 or prohibited by § 8(b), but *not* in determining whether the activity is a "labor dispute" under § 2(9).

Moreover, the conclusion that a purely political work stoppage is not protected under § 7 means simply that the employer is not prohibited by § 8(a)(1) of the NLRA, 29 U. S. C. § 158(a)(1), from discharging or disciplining employees for this activity. It hardly establishes that no "labor dispute" existed within the meaning of § 2(9). Similarly, if the employees protested such sanctions under the collective-bargaining agreement, an arbitrator might ultimately conclude that the sanctions were proper, but this would not alter the obvious fact that the matter is a labor dispute.

versy." *Columbia River Packers Assn., Inc.* v. *Hinton*, 315
U. S. 143, 147 (1942). In this case, the Employer and the
Union representing its employees are the disputants, and
their dispute concerns the interpretation of the labor con-
tract that defines their relationship.[12] Thus, the employer-
employee relationship is the matrix of this controversy.

Nevertheless, the Employer argues that a "labor dispute"
exists only when the Union's action is taken in its own "eco-
nomic self-interest." The Employer cites *Musicians* v. *Car-
roll*, 391 U. S. 99 (1968), and *Columbia River Packers Assn.*,
*supra*, for this proposition. In these cases, however, the
Court addressed the very different question whether the rel-
evant parties were "labor" groups involved in a labor dispute
for the purpose of determining whether their actions were
exempt from the antitrust laws.[13] These cases do not hold

---

[12] A labor dispute might be present under the facts of this case even
in the absence of the dispute over the scope of the no-strike clause. Re-
gardless of the political nature of the Union's objections to handling Soviet-
bound cargo, these objections were expressed in a work stoppage by
employees against their employer, which focused on particular work as-
signments. Thus, apart from the collective-bargaining agreement, the
employer-employee relationship would be the matrix of the controversy.
We need not decide this question, however, because this case does involve
a dispute over the interpretation of the parties' collective-bargaining
agreement.

[13] In *Musicians*, the Court held that, although orchestra leaders acted as
independent contractors with respect to certain "club-date" engagements,
the union's involvement with the leaders was not a combination with a
nonlabor group in violation of the Sherman Act. In finding that the lead-
ers were a "labor group," and a party to a labor dispute, the Court relied on
the "'presence of a job or wage competition or some other economic inter-
relationship affecting legitimate union interests between the union mem-
bers and the independent contractors.'" 391 U. S., at 106 (quoting the
opinion of the District Court). In *Columbia River Packers Assn.*, the
Court found that the union was merely an association of independent fish
sellers involved in a controversy with fish buyers over a contract for the
sale of fish; they were not employees of the buyers, nor did they seek to be.
315 U. S., at 147.

The Employer's reliance on *Bakery Drivers* v. *Wagshal*, 333 U. S. 437
(1948), is similarly misplaced. In that case, the Court held only that a con-

that a union's noneconomic motive inevitably takes the dispute out of the Norris-La Guardia Act, but only that the protections of that Act do not extend to labor organizations when they cease to act as labor groups or when they enter into illegal combinations with nonlabor groups in restraint of trade.[14] Here, there is no question that the Union is a labor group, representing its own interests in a dispute with the Employer over the employees' obligation to provide labor.

Even in cases where the disputants did not stand in the relationship of employer and employee, this Court has held that the existence of noneconomic motives does not make the Norris-La Guardia Act inapplicable. For example, in *New Negro Alliance* v. *Sanitary Grocery Co.*, 303 U. S. 552 (1938), this Court held that the Norris-La Guardia Act prohibited an injunction against picketing by members of a civic group, which was aimed at inducing a store to employ Negro employees. In determining that the group and its members were "persons interested in a labor dispute" within the meaning of § 13, the Court found it immaterial that the picketers, who were neither union organizers nor store employees, were not asserting economic interests commonly associated with labor unions—*e. g.*, terms and conditions of employment in the narrower sense of wages, hours, unionization, or betterment of working conditions. *Id.*, at 560. Although the lower courts found Norris-La Guardia inapplicable because the picketing was motivated by the group's "political" or "social" goals of improving the position of Negroes generally, and not by the desire to improve specific conditions of employment, this Court reasoned: "The Act does not concern it-

troversy between two businessmen over delivery times or methods of payment does not become a labor dispute merely because a union representative, with or without his employer's consent, sought to obtain payment pursuant to a particular method. *Id.*, at 443–444.

[14] The Employer's economic-motive analysis also leads to the untenable result that strikes in protest of unreasonably unsafe conditions and some sympathy strikes are not "labor disputes."

self with the background or the motives of the dispute." *Id.*, at 561.

B

The Employer's argument that the Union's motivation for engaging in a work stoppage determines whether the Norris-La Guardia Act applies is also contrary to the legislative history of that Act. The Act was enacted in response to federal-court intervention on behalf of employers through the use of injunctive powers against unions and other associations of employees. This intervention had caused the federal judiciary to fall into disrepute among large segments of this Nation's population. See generally S. Rep. No. 163, 72d Cong., 1st Sess., 8, 16–18 (1932); 75 Cong. Rec. 4915 (1932) (remarks of Sen. Wagner).

Apart from the procedural unfairness of many labor injunctions, one of the greatest evils associated with them was the use of tort-law doctrines, which often made the lawfulness of a strike depend upon judicial views of social and economic policy. See, *e. g.*, Cox, Current Problems in the Law of Grievance Arbitration, 30 Rocky Mountain L. Rev. 247, 256 (1958). In debating the Act, its supporters repeatedly expressed disapproval of this Court's interpretations of the Clayton Act's labor exemption—interpretations which permitted a federal judge to find the Act inapplicable based on his or her appraisal of the "legitimacy" of the union's objectives.[15] See, *e. g.*, 75 Cong. Rec. 4916 (1932) (remarks of Sen. Wagner) (definition of labor dispute expanded to override *Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443 (1921) (holding a strike and picketing with the purpose of unionizing a plant not a labor dispute because the objectives were not legitimate and there was no employer-employee relationship between the disputants)); 75 Cong. Rec., at

---

[15] See *Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443, 468–469 (1921). See also *Bedford Cut Stone Co.* v. *Stone Cutters*, 274 U. S. 37, 54–55 (1927).

5487–5488 (remarks of Rep. Celler) (bill brought forth to remedy decisions allowing injunction in *Duplex* and in *Bedford Cut Stone Co.* v. *Stone Cutters,* 274 U. S. 37 (1927) (holding that decision by workers not to work on nonunion goods not a labor dispute)). See also 75 Cong. Rec., at 4686 (remarks of Sen. Hebert) (Committee minority agreed that injunctions should not have issued in *Bedford* and *Duplex*). See generally H. R. Rep. No. 669, 72d Cong., 1st Sess., 8, 10–11 (1932). The legislative history is replete with criticisms of the ability of powerful employers to use federal judges as "strike-breaking" agencies; by virtue of their almost unbridled "equitable discretion," federal judges could enter injunctions based on their disapproval of the employees' objectives, or on the theory that these objectives or actions, although lawful if pursued by a single employee, became unlawful when pursued through the "conspiracy" of concerted activity. See, *e. g.*, 75 Cong. Rec., at 4928–4938, 5466–5468, 5478–5481, 5487–5490.

Furthermore, the question whether the Norris-La Guardia Act would apply to politically motivated strikes was brought to the attention of the 72d Congress when it passed the Act. Opponents criticized the definition of "labor dispute" in § 13(c) on the ground that it would cover politically motivated strikes. Representative Beck argued that federal courts should have jurisdiction to enjoin political strikes like those threatened by labor unions in Europe. *Id.,* at 5471–5473 (discussing threatened strike by British unions protesting the cancellation of leases held by Communist Party members, and threatened strikes by Belgian unions protesting a decision to supply military aid to Poland).[16] In response, Representative Oliver argued that the federal courts should not have the power to enjoin such strikes. *Id.,* at 5480–5481.

---

[16] The thrust of this objection was that the Act's definition of a labor dispute "takes no account whatever of the motives and purposes with which a nation-wide strike or boycott can be commenced and prosecuted." 75 Cong. Rec. 5472 (1932) (remarks of Rep. Beck).

Finally, Representative Beck offered an amendment to the Act that would have permitted federal courts to enjoin strikes called for ulterior purposes, including political motives. This amendment was defeated soundly. See *id.*, at 5507.

Further support for our conclusion that Congress believed that the Norris-La Guardia Act applies to work stoppages instituted for political reasons can be found in the legislative history of the 1947 amendments to the NLRA. That history reveals that Congress rejected a proposal to repeal the Norris-La Guardia Act with respect to one broad category of political strikes.[17] The House bill included definitions of various kinds of labor disputes. See H. R. 3020, 80th Cong., 1st Sess., § 2, 1 Legislative History of the LMRA 158, 160 (1947) (Leg. Hist.); H. R. Rep. No. 245, 80th Cong., 1st Sess., 1, 18–19 (1947), 1 Leg. Hist. 292, 309–310. Of relevance here, § 2(13) defined a "sympathy" strike as a strike "called or conducted not by reason of any dispute between the employer and the employees on strike or participating in such concerted interference, but rather by reason of either (A) a dispute involving another employer or other employees of the same employer, or (B) *disagreement with some governmental policy.*" H. R. 3020, § 2(13), 1 Leg. Hist. 168 (emphasis added). Section 12 of the House bill made this kind of strike "unlawful concerted activity," and "it remove[d] the immunities that the present laws confer upon persons who engage in them." H. R. Rep. No. 245, *supra*, at 23, 1 Leg. Hist.

---

[17] In relying on this history, we do not argue that congressional rejection of a broad repeal of the Norris-La Guardia Act precludes accommodation of that Act to the LMRA. See *Sinclair Refining Co.* v. *Atkinson,* 370 U. S. 195, 204–210 (1962). In *Boys Markets, Inc.* v. *Retail Clerks,* 398 U. S., at 249, this Court put that argument to rest. Rather, we rely on this legislative history because it demonstrates that Congress believed that the Norris-La Guardia Act did apply to controversies concerning politically motivated work stoppages. Furthermore, in this case, unlike *Boys Markets,* we are not asked to accommodate the Norris-La Guardia Act to a specific federal Act or to the strong policy favoring arbitration.

314. In particular, the Norris-La Guardia Act would not apply to suits brought by private parties to enjoin such activity, and damages could be recovered. See H. R. Rep. No. 245, *supra*, at 23–24, 43–44, 1 Leg. Hist. 314–315, 334–335. In explaining these provisions, the House Report stated that strikes "against a policy of national or local government, which the employer cannot change," should be made unlawful, and that "[t]he bill makes inapplicable in such suits the Norris-La Guardia Act, which heretofore has protected parties to industrial strife from the consequences of their lawlessness." H. R. Rep. No. 245, *supra*, at 24, 44, 1 Leg. Hist. 315, 335.

The Conference Committee accepted the Senate version, which had eliminated these provisions of the House bill.[18] The House Managers' statement accompanying the Conference Report explained that its recommendation did not go as far as the House bill, that § 8(b) prohibits jurisdictional strikes and illegal secondary boycotts, and that the Board, *not private parties*, may petition a district court under § 10(k) or § 10(*l*) to enjoin these activities notwithstanding the provisions of the Norris-La Guardia Act. H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess., 36, 42–43, 57, 58–59 (1947), 1 Leg. Hist. 540, 546–547, 561, 562–563. In short, Congress declined in 1947 to adopt a broad "political motivation" exception to the Norris-La Guardia Act for strikes in protest of some governmental policy. Instead, if a strike of this nature

---

[18] The Senate had declined to adopt these provisions of the House bill. The Senate Report explained that it did not want to impair labor's social gains under the Norris-La Guardia Act and the NLRA of 1935, but instead wanted to remedy "specific types of injustice" or "clear inequities" by "precise and carefully drawn legislation." S. Rep. No. 105, 80th Cong., 1st Sess., 1 (1947), 1 Leg. Hist. 407. Some of the concerted activities listed in § 12 of the House bill were made unfair labor practices, and the National Labor Relations Board, *not private parties*, could petition a district court for injunctions against certain unfair labor practices. See S. Rep. No. 105, *supra*, at 35, 40, 1 Leg. Hist., 441, 446 (reciting proposed revisions to NLRA, §§ 8(b), 10(k), 10(*l*)).

takes the form of a secondary boycott prohibited by § 8(b), Congress chose to give the Board, not private parties, the power to petition a federal district court for an injunction. See 29 U. S. C. §§ 160(k), 160(*l*). Cf. *Longshoremen* v. *Allied International, Inc.*, 456 U. S. 212 (1982).

## C

This case, brought by the Employer to enforce its collective-bargaining agreement with the Union, involves a "labor dispute" within any common-sense meaning of that term. Were we to ignore this plain interpretation and hold that the political motivation underlying the work stoppage removes this controversy from the prohibitions of the Norris-La Guardia Act, we would embroil federal judges in the very scrutiny of "legitimate objectives" that Congress intended to prevent when it passed that Act. The applicability not only of § 4, but also of all of the procedural protections embodied in that Act, would turn on a single federal judge's perception of the motivation underlying the concerted activity.[19] The Employer's interpretation is simply inconsistent with the

---

[19] This proposed exception does not limit the judge's discretion to consideration of specified external conduct or of provisions in a collective-bargaining agreement, as does the *Boys Markets* exception. It provides no guidance to judges in dealing with concerted activity arguably designed to achieve both political and labor-related goals. Such mixed-motivation cases are bound to arise. For example, in *United States Steel Corp.* v. *United Mine Workers*, 519 F. 2d 1236 (CA5 1975), miners picketed another employer for importing coal from South Africa. The Court of Appeals held that the Norris-La Guardia Act applied, and that the *Boys Markets* exception was not available, because "the miners' action was not aimed at [their employer] at all, but rather at the national policy of this country's permitting the importation of South African coal." 519 F. 2d, at 1247 (footnote omitted). Under the political-motivation exception, even if the miners had picketed because slave labor was employed to mine the imported coal, the Norris-La Guardia Act might not apply. Minor variations in the facts would endow the courts with, or divest them of, jurisdiction to issue an injunction, and would create difficult line-drawing problems.

need, expressed by Congress when it enacted the Norris-La Guardia Act, for clear "mileposts for judges to follow." 75 Cong. Rec. 4935 (1932) (remarks of Sen. Bratton).

In essence, the Employer asks us to disregard the legislative history of the Act and to distort the definition of a labor dispute in order to reach what it believes to be an "equitable" result. The Employer's real complaint, however, is not with the Union's political objections to the conduct of the Soviet Union, but with what the Employer views as the Union's breach of contract. The Employer's frustration with this alleged breach of contract should not be remedied by characterizing it as other than a labor dispute. We will not adopt by judicial fiat an interpretation that Congress specifically rejected when it enacted the 1947 amendments to the NLRA. See generally n. 17, *supra*. In the past, we have consistently declined to constrict Norris-La Guardia's broad prohibitions except in narrowly defined situations where accommodation of that Act to specific congressional policy is necessary. We refuse to deviate from that path today.

## IV

Alternatively, the Employer argues that the Union's work stoppage may be enjoined under the rationale of *Boys Markets, Inc.* v. *Retail Clerks*, 398 U. S. 235 (1970), and *Buffalo Forge Co.* v. *Steelworkers*, 428 U. S. 397 (1976), because the dispute underlying the work stoppage is arbitrable under the collective-bargaining agreement. In making this argument, the Employer disavows its earlier argument that the underlying dispute is purely political, and asserts that the Union's work stoppage was motivated by a disagreement with the Employer over the management-rights clause in the collective-bargaining agreement. The Solicitor General, in an *amicus* brief filed on behalf of the United States, agrees with the Employer that the work stoppage may be enjoined pending arbitration. He contends that in addition to the political dispute, disputes concerning both the management-rights

clause and the work-conditions clause underlie the work stoppage, and that at least one of these disputes is arguably arbitrable.[20]

We disagree. *Buffalo Forge* makes it clear that a *Boys Markets* injunction pending arbitration should not issue unless the dispute underlying the work stoppage is arbitrable. The rationale of *Buffalo Forge* compels the conclusion that the Union's work stoppage, called to protest the invasion of Afghanistan by the Soviet Union, may not be enjoined pending the arbitrator's decision on whether the work stoppage violates the no-strike clause in the collective-bargaining agreement. The underlying dispute, whether viewed as an expression of the Union's "moral outrage" at Soviet military policy or as an expression of sympathy for the people of Afghanistan, is plainly not arbitrable under the collective-bargaining agreement.

The attempts by the Solicitor General and the Employer to characterize the underlying dispute as arbitrable do not withstand analysis. The "underlying" disputes concerning the management-rights clause or the work-conditions clause simply did not trigger the work stoppage. To the contrary, the applicability of these clauses to the dispute, if any, was triggered by the work stoppage itself. Consideration of

---

[20] The management-rights clause provides:

"The Management of the Employer's business and the direction of the work force in the operation of the business are exclusively vested in the Employer as functions of Management. Except as specifically provided in the Agreement, all of the rights, powers, and authority Employer had prior to signing of this Agreement are retained by the Employer."

The work-conditions clause provides:

"Where hardship is claimed by the Union because of unreasonable or burdensome conditions or where work methods or operations materially change in the future, the problem shall first be discussed between the local and Management involved. In the event an agreement cannot be reached, either party may refer the dispute to the Joint Negotiating Committee and, if the matter cannot be resolved by that Committee, either party may then refer the question to an arbitrator in accordance with the procedure set forth in Clause 15(B)."

whether the strike intruded on the management-rights clause or was permitted by the work-conditions clause may inform the arbitrator's ultimate decision on whether the strike violates the no-strike clause. Indeed, the question whether striking over a nonarbitrable issue violates other provisions of the collective-bargaining agreement may itself be an arbitrable dispute. The fact remains, however, that the strike itself was not over an arbitrable dispute and therefore may not be enjoined pending the arbitrator's ruling on the legality of the strike under the collective-bargaining agreement.

The weaknesses in the analysis of the Employer and the Solicitor General can perhaps best be demonstrated by applying it to a pure sympathy strike, which clearly cannot be enjoined pending arbitration under the rationale of *Buffalo Forge*. If this work stoppage were a pure sympathy strike, it could be characterized alternatively as a dispute over the Employer's right to choose to do business with the employer embroiled in a dispute with a sister union, as a dispute over management's right to assign and direct work, or as a dispute over whether requiring the union to handle goods of the employer whose employees are on strike is an unreasonable work condition.[21] None of these characterizations, however, alters the fact, essential to the rationale of *Buffalo Forge*, that the strike was not over an arbitrable issue and therefore did not directly frustrate the arbitration process.

The Employer's argument that this work stoppage may be enjoined pending arbitration really reflects a fundamental

---

[21] In fact, the employer in *Buffalo Forge* made just such a claim. In addition to alleging breach of the no-strike clause, it claimed that the strike was caused by "refusal to follow a supervisor's instructions to cross the . . . picket line." *Buffalo Forge*, 428 U. S., at 401. The District Court found that the strike was in sympathy with the sister union and was not over a dispute that the parties were contractually bound to arbitrate. *Id.*, at 402–403. On appeal, the employer did not press its argument that the work stoppage was in part a protest over truckdriving assignments. *Id.*, at 403, n. 8.

disagreement with the rationale of *Buffalo Forge*, and not a belief that this rationale permits an injunction in this case. The Employer apparently disagrees with the *Buffalo Forge* Court's conclusion that, in agreeing to broad arbitration and no-strike clauses, the parties do not bargain for injunctive relief to restore the status quo pending the arbitrator's decision on the legality of the strike under the collective-bargaining agreement, without regard to what triggered the strike. Instead, they bargain only for specific enforcement of the union's promise to arbitrate the underlying grievance before resorting to a strike. See 428 U. S., at 410–412. The Employer also apparently believes that *Buffalo Forge* frustrates the arbitration process and encourages industrial strife. But see *id.*, at 412.[22] However, this disagreement with *Buffalo Forge* only argues for reconsidering that decision.[23] It does not justify distorting the rationale of that case beyond recognition in order to reach the result urged by the Employer.

V

In conclusion, we hold that an employer's § 301 action to enforce the provisions of a collective-bargaining agreement allegedly violated by a union's work stoppage involves a "labor dispute" within the meaning of the Norris-La Guardia Act, without regard to the motivation underlying the union's

---

[22] The Employer argues that industrial strife is encouraged because employers are given the incentive to discharge or discipline the workers for refusing to work, which is likely to precipitate further strikes. According to this argument, the strike, which began over a nonarbitrable dispute, is transformed into a dispute over an arbitrable issue, *i. e.*, the employer's right under the collective-bargaining agreement to discipline these workers, and may be enjoined under the *Boys Markets/Buffalo Forge* exception. See, *e. g., Complete Auto Transit, Inc.* v. *Reis*, 614 F. 2d 1110, 1113–1114 (CA6 1980), aff'd on other grounds, 451 U. S. 401 (1981). This Court has not addressed the validity of this "transformation" analysis. See *Complete Auto Transit, Inc.* v. *Reis*, 451 U. S., at 405, n. 4.

[23] The Employer has also requested that we reconsider our decision in *Buffalo Forge Co.* v. *Steelworkers*. We decline this invitation.

decision not to provide labor. Under our decisions in *Boys Markets* and *Buffalo Forge*, when the underlying dispute is not arbitrable, the employer may not obtain injunctive relief pending the arbitrator's ruling on the legality of the strike under the collective-bargaining agreement. Accordingly, the decision of the Court of Appeals is

*Affirmed.*

JUSTICE O'CONNOR, concurring in the judgment.

Based on the legislative history of the Norris-La Guardia Act, 29 U. S. C. § 101 *et seq.*, and our previous cases interpreting it, *e. g.*, *New Negro Alliance* v. *Sanitary Grocery Co.*, 303 U. S. 552 (1938), the Court correctly concludes that this case involves a labor dispute within the meaning of § 4 of the Act, 29 U. S. C. § 104. The Court also correctly determines that under *Buffalo Forge Co.* v. *Steelworkers*, 428 U. S. 397 (1976), no injunction may issue pending arbitration because the underlying political dispute is not arbitrable under the collective-bargaining agreement. Unless the Court is willing to overrule *Buffalo Forge*, the conclusion reached by the Court in this case is inescapable. Therefore, I concur in the judgment.

CHIEF JUSTICE BURGER, with whom JUSTICE POWELL joins, dissenting.

## I

This case in no sense involves or grows out of a labor dispute as that term is defined in § 13(c) of the Norris-La Guardia Act, 29 U. S. C. § 113(c). See *ante*, at 709–710, n. 9. Section 13(c) defines a labor dispute as "any controversy concerning terms or conditions of employment . . . ."[1] The dispute in this case is a political dispute and has no relation to any controversy concerning terms or conditions of em-

---

[1] Section 13(c) also includes union organizational activity within its definition of labor dispute, but this case clearly does not involve such activity.

ployment. If Congress had intended to bar federal courts from issuing injunctions in political disputes, it could have simply prohibited federal courts from enjoining strikes rather than limiting its prohibition to controversies concerning terms or conditions of employment. Accordingly, I disagree with the Court's conclusion that the Norris-La Guardia Act bars a federal court from enjoining this politically motivated work stoppage.

The International Longshoremen's Association objects to the Soviet Union's invasion of Afghanistan. As a consequence, it announced that it would not handle any cargo bound to, or coming from, the Soviet Union, or any cargo carried on Soviet ships. This case commenced after the union, pursuant to its political position, refused to load superphosphoric acid onto certain ships bound for the Soviet Union. The union has no objection to any terms or conditions of employment; it would have loaded the superphosphoric acid on any non-Soviet ship bound for a destination other than the Soviet Union. No one has suggested that the union's action is actually motivated to obtain concessions concerning employment conditions. The union refused to handle the cargo simply because a foreign country invaded a neighboring country and the union desired to express its opposition to the invasion. Thus the plain meaning of § 13(c) leads to the conclusion that this case does not involve or grow out of a labor dispute because the union members are not seeking to change their terms or conditions of employment.

As the Court recognizes, we have held that the test of whether the Norris-La Guardia Act applies is whether "the employer-employee relationship [is] the matrix of the controversy." *Columbia River Packers Assn., Inc.* v. *Hinton,* 315 U. S. 143, 147 (1942); quoted *ante,* at 712–713. Federal Courts of Appeals have stated that unions are protected by the Norris-La Guardia Act when they act to advance the economic interests of their members. See, *e. g., Brotherhood of Railroad Trainmen* v. *Atlantic Coast Line R. Co.,* 362 F. 2d

649, 654 (CA5 1966). These cases illustrate the plain meaning of § 13(c)'s definition of labor dispute—the Norris-La Guardia Act protects union organizational efforts and efforts to improve working conditions.

The Court errs gravely in finding that the matrix of this controversy is the union's relationship with the petitioners. The union's dispute with the petitioners merely flows from its decision to demonstrate its opposition to the invasion of Afghanistan. No economic interests of union members are involved; indeed, the union's policy is contrary to its members' economic interests since it reduces the amount of available work.[2] Thus, the cases generally explicating the meaning of § 13(c) lend no support to the notion that this case involves a labor dispute.

The federal courts have consistently recognized that the Norris-La Guardia Act does not apply to politically motivated work stoppages concerning subjects over which employers have no control. These courts, in cases which are for all practical purposes indistinguishable from this case—and which often involved the International Longshoremen's Association—properly concluded that the Act only applies to economic disputes.[3] This Court has never before held, as it

---

[2] The Court's reliance on *New Negro Alliance* v. *Sanitary Grocery Co.*, 303 U. S. 552 (1938), is misplaced. *Ante*, at 714–715. The picketers in that case might not have been seeking to better their own personal economic position, but their purpose was to affect the terms and conditions of employment of the picketed store, since their object was to persuade the store to employ Negroes. Section 13(c) explicitly states that the coverage of the Act does not depend on whether "the disputants stand in the proximate relation of employer and employee." *Ante*, at 710, n. 9.

[3] See *Khedivial Line, S. A. E.* v. *Seafarers International Union*, 278 F. 2d 49, 50–51 (CA2 1960) (politically motivated blacklist of Egyptian ships to retaliate for Egyptian blacklist of American ships that dealt with Israel is not "labor dispute" triggering Norris-La Guardia); *West Gulf Maritime Assn.* v. *International Longshoremen's Assn.*, 413 F. Supp. 372 (SD Tex. 1975), summarily aff'd, 531 F. 2d 574 (CA5 1976) (union's refusal, on political grounds, in violation of a no-strike agreement, to load grain on a ship bound for the Soviet Union does not present a "labor dispute").

holds here, that the Norris-La Guardia Act protects strikes resulting from political disputes rather than from labor disputes. Since the meaning of the words of the statute is plain, and since the applicable precedent supports the conclusion that this is not a labor dispute, we ought to conclude that politically motivated strikes are outside the coverage of the Norris-La Guardia Act.[4]

Finally, the Court argues that a common-sense interpretation of the meaning of the term "labor dispute" supports its conclusion. But the "common-sense" meaning of a term is not controlling when Congress has provided, as it provided in § 13(c), an explicit definition of a labor dispute. "Common sense" and legislative history ought not change the meaning of the unambiguous words of a statute. It is not contended that any act of petitioners to improve the terms or conditions

---

[4] The excerpts from the legislative history relied upon by the Court fall short of the clear evidence required to overcome the plain language of § 13(c). See, *e. g.*, *Bread Political Action Committee* v. *FEC*, 455 U. S. 577, 581 (1982). In 1947, Congress declined to amend the federal labor laws so that strikes protesting "disagreement with some governmental policy" would not be protected by the Norris-La Guardia Act. H. R. 3020, 80th Cong., 1st Sess., § 2(13)(B) (1947), 1 Legislative History of the LMRA 168 (1947); *ante*, at 717. However, the language of the rejected House version of the amendment was quite broad. There are cases in which unions might disagree with governmental policy and properly take collective action protesting it in order to advance the legitimate economic interests of union members if the terms or conditions of their employment would be affected. Congress might have rejected the House version because of fear that its broad reach would render legitimate union activity unprotected.

In 1932, Congress rejected an amendment which would have permitted federal courts to enjoin acts "performed or threatened for an unlawful purpose or with an unlawful intent . . . ." 75 Cong. Rec. 5507 (1932); *ante*, at 716–717. This amendment would have swept more broadly than the plain language of § 13(c) as adopted. Indeed, Representative Beck's amendment could have rendered the Norris-La Guardia Act a nullity, since federal judges in the 1930's would have been able to enjoin a strike merely by finding it motivated by an "unlawful purpose." Thus the legislative history does not lead to or compel a conclusion in this case contrary to the plain language of § 13(c).

of employment would have persuaded the union to load the ships. Hence there is no labor dispute under the Norris-La Guardia Act.

## II

This case, together with our recent decision in *Longshoremen* v. *Allied International, Inc.*, 456 U. S. 212 (1982), illustrates the inherent flaw in the holding in *Buffalo Forge Co.* v. *Steelworkers*, 428 U. S. 397 (1976). If the Court cannot give to ordinary words their ordinary meaning and grasp that the dispute in this case is a purely political dispute rather than having any relation to a labor dispute, it should overrule *Buffalo Forge*.

The controversy in *Allied International* also resulted from the International Longshoremen's Association's protest over the Soviet invasion of Afghanistan. There we held that the union's refusal to unload shipments from the Soviet Union was a secondary boycott prohibited by § 8(b)(4) of the National Labor Relations Act, 29 U. S. C. § 158(b)(4). The union is therefore liable for damages as a result of its refusal to unload the shipments. Yet the Court today holds that the union may not be enjoined from refusing to load cargo onto ships bound for the Soviet Union.

This is all the more perplexing because the union entered into an agreement with petitioners which contained an unequivocal no-strike clause: "During the term of this Agreement, . . . the Union agrees there shall not be any strike *of any kind* or degree whatsoever, . . . for *any cause whatsoever*." (Emphasis added.) *Ante*, at 706. In *Allied International* this union was found liable for damages caused to a party with which it had no such agreement. Here, however, despite the existence of the no-strike agreement between petitioners and the union, the Court holds that the union's illegal acts may not be enjoined.

To reach this strange result, the Court first decides that this case involves a labor dispute rather than a political dispute, and therefore is within the scope of the Norris-

La Guardia Act. The Court then contradicts itself and concludes that, since the dispute is really a political protest over Soviet aggression, it may not be enjoined under the *Buffalo Forge* exception to the rule of *Boys Markets, Inc.* v. *Retail Clerks*, 398 U. S. 235 (1970), since a federal court cannot resolve the actual dispute. This case, together with *Allied International*, persuades me that the artificial *Buffalo Forge* exception should be abolished. Rather than continuing to engage in mechanical and contradictory analyses as to the character of disputes such as this one, we should hold that a federal court may enjoin a strike pending arbitration when the striking union has agreed to a contract with a no-strike clause such as the one agreed to by petitioners and the ILA. That is what we seemed to hold in *Boys Markets,* and we should not have tinkered with that holding in *Buffalo Forge.*

There is no rational way to reconcile this holding with *Allied International*. If we must overrule *Buffalo Forge* to come to a consistent result, we should do so.

JUSTICE POWELL, dissenting.

The no-strike clause agreed to by the parties in this case could scarcely be more emphatic: "During the term of this Agreement, . . . the Union agrees there shall not be any strike of any kind or degree whatsoever, . . . for *any cause whatsoever*" (emphasis added). *Ante,* at 706. Such a clause is one of the most significant provisions in the bargaining agreement. One can fairly assume that the employer gave considerable ground in other areas of the agreement to gain this apparent guarantee that all disagreements would go first to arbitration. Thus, under the plain language of the agreement of the parties, the strike by the respondents should have been enjoined pending arbitration.

But in labor law—since this Court's decision in *Buffalo Forge Co.* v. *Steelworkers*, 428 U. S. 397 (1976)—plain language agreed to by a union does not bind it. *Buffalo Forge* is an aberration. It cannot be reconciled with labor law pol-

icy of encouraging industrial peace through arbitration. It severely undercuts *Boys Markets, Inc.* v. *Retail Clerks*, 398 U. S. 235 (1970). In a word, *Buffalo Forge* should be overruled.

The internal contradictions in today's decision by the Court further illustrate absence of principle in *Buffalo Forge*'s reasoning. The Court argues that now we must divide the dispute in this case into the "underlying" dispute over Soviet policy and the "other" dispute over the scope of the no-strike clause. I consider this method of analysis artificial and unprincipled. On the one hand, the Court must characterize the dispute in this case as a labor dispute—involving the scope of the no-strike clause—to bring the dispute within the scope of the Norris-La Guardia Act. But on the other hand, *Buffalo Forge* requires the Court to contradict itself by insisting that the dispute is "really" over Soviet aggression and therefore that the rule of *Boy's Market,* and the federal policy in support of arbitration, are inapplicable.

The Court should not have it both ways. So long as it adheres to the aberrant analysis in *Buffalo Forge,* I agree with THE CHIEF JUSTICE that the dispute in this case must be viewed as a political dispute outside the scope of the Norris-La Guardia Act. I therefore join his dissenting opinion.

JUSTICE STEVENS, dissenting.

For the reasons stated in Part I of THE CHIEF JUSTICE's dissenting opinion in this case, as well as the reasons stated in Part I of my dissenting opinion in *Buffalo Forge Co.* v. *Steelworkers*, 428 U. S. 397, 415–424, I respectfully dissent.