PHILADELPHIA NEWSPAPERS, INC.

v.

NEWSPAPER & MAGAZINE EMPLOY-
EES UNION, Edward T. Savryk, James
Hart, Jr., Michael Bernstein, William
Brandt, Thomas Murphy, Gerald Mur-
phy, John Doe, Richard Roe and all
others conspiring, acting in concert, or
otherwise participating with then [sic]
or acting in their aid or behalf.

Civ. A. No. 86–2342.

United States District Court,
E.D. Pennsylvania.

May 7, 1986.
Memorandum of Decision Aug. 25, 1986.

Richard S. Meyer, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for plaintiff.

Sidney Ginsberg, Philadelphia, for defendant.

## FINDINGS OF FACT and CONCLUSIONS OF LAW

SHAPIRO, District Judge.

On April 23, 1986, plaintiff filed a complaint for a preliminary and permanent injunction restraining defendants from engaging in a work slow down in violation of the Collective Bargaining Agreement between the parties. A stand-still agreement pending a hearing on a preliminary injunction scheduled for April 30, 1986 made it unnecessary to consider plaintiff's motion for a temporary restraining order filed concurrently with the complaint. A hearing was held on April 30, and May 1, 1986; after consideration of the contentions of the parties, the exhibits admitted in evidence, the testimony of the witnesses with due regard to their demeanor and the credibility of their statements in the light of the

entire record, and the legal authorities submitted by counsel for both parties, the court will issue a preliminary injunction based on the following findings of fact and conclusions of law.

### Findings of Fact

Plaintiff is Philadelphia Newspapers, Inc. ("PNI"), a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its plant and principal place of business at 400 North Broad Street, Philadelphia, Pennsylvania.

Defendant Newspaper & Magazines Employees Union (the "Union") is an unincorporated association with an address at 1420 Walnut Street, Philadelphia, Pennsylvania. Defendant Edward T. Savryk is an individual and President of defendant Union. Defendant Michael Bernstein is an individual and Vice President of defendant Union. Defendant James Hart, Jr. is an individual and Secretary-Treasurer of defendant Union. Defendants William Brandt, Gerald Murphy and Thomas Murphy are individuals and Chapel Chairmen of defendant Union. The remaining defendants are all others who allegedly are conspiring, acting in concert, or otherwise participating with the named defendants or acting in their aid or behalf, including other officers and members of defendant Union.

Plaintiff PNI and defendant Union are parties to a Collective Bargaining Agreement (the "Agreement") covering the terms and conditions of employment of mailers employed by PNI (Joint Exhibit 1).

Section 5 of the Agreement provides that all disputes arising as to the "construction, interpretation, application, or execution of this Agreement, or side letters of agreement entered into pursuant thereto," *shall* be subject to a grievance procedure which includes arbitration.[1]

Section 19 of the Agreement provides, in pertinent part, that the "Newspaper & Magazine Employees Union shall not permit any member or members to engage in a strike, boycott, work stoppage or slow down or to aid or encourage directly or indirectly such action against any newspaper party to this contract."

On the night shift on April 22, 1986, shortly after midnight and again on the morning shift the next day at about 7:30 a.m., defendant Union and its members engaged in a wilful and deliberate slow down by concerted exercise of the right to change job assignments under Section 12 of the Agreement.

The work slow down concerned a management change in operational practice in mailroom preparation of the advance portion of the Sunday *Inquirer, i.e.,* a split comic section, in connection with changes in automated equipment; the change allegedly was made without proper notice to the Union. Notice of manning changes involving new machinery is covered by Section 6 of the Agreement.

The Union and PNI are contractually bound to arbitrate the underlying disputes under Section 5 and Section 6 of the Agree-

---

**1.** Section 5 of the Agreement provides:

It is agreed between the parties hereto that fruitless controversies must be avoided and every effort be made to maintain and further the present harmonious relationship. To this end both parties will, in every instance, give prompt attention to disputes and will in good faith endeavor to settle all differences growing out of the discharge or discipline of an employee covered by this contract and all questions which may arise as to the construction, interpretation, application or execution of this Agreement, or side letters of agreement entered into pursuant thereto, or any alleged violation thereof by amicable discussion. In the event that such differences cannot be settled in this manner, such disputes shall be referred to a Joint Standing Committee composed of two representatives of the Publisher and two representatives of the Union. In case of a vacancy or the absence or refusal to act of any such representative, another shall be appointed in his place. This Committee shall meet within fifteen (15) days (except when extended by mutual agreement) when any such difference shall have been referred to it by either party to this Agreement. Should the Joint Committee be unable to agree within fifteen (15) days, the matter shall be determined by arbitration under the rules of the American Arbitration Association. The results of the arbitration shall be final and binding on both parties. Pending the settlement of any dispute Publisher's orders will be followed. All expenses incurred by the Arbitration shall be borne equally by the parties to this Agreement.

ment. Therefore, there is a substantial likelihood that PNI will succeed on the merits of the dispute, *i.e.*, the arbitrability of the underlying disputes.

The Union breached its affirmative obligation under the effective Agreement to halt the slow down.

PNI did not ratify and/or sanction the slow down.

Additional slow downs are likely to occur unless restrained by the court pending arbitration.

Unless defendants are enjoined, PNI will suffer immediate, substantial and irreparable harm.

Greater injury would be inflicted upon plaintiff by denial of injunctive relief than will be inflicted upon defendants by granting such relief.

An injunction is in the public interest.

### Discussion

██ Section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104, limits this court's jurisdiction to enjoin a strike[2] arising out of a labor dispute. But Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), provides that federal courts have jurisdiction to enforce collective bargaining agreements incorporating no-strike provisions whether express or implied. In *Boys Market, Inc. v. Retail Clerks Union Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Supreme Court reconciled an apparent conflict between these two statutes by allowing a narrow exception to the anti-injunction provisions of the Norris-LaGuardia Act in order to further the national labor policy favoring peaceful settlement of disputes through arbitration embodied in the Labor Management Relations Act. The Norris-LaGuardia Act does not prohibit enjoining a strike arising out of a labor dispute if: (1) the strike is in breach of a no-strike obligation under the effective collective bar-

gaining agreement; (2) the parties are contractually bound to arbitrate the grievance; and (3) the injunction is otherwise warranted under principles of equity jurisprudence. *Boys Market, supra* at 253, 90 S.Ct. at 1593.

██ However, the *Boys Market* exception to Section 4 of the Norris-LaGuardia Act applies only if the strike is over an arbitrable issue; *Buffalo Forge Co. v. United Steelworkers of America*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). The mere arbitrability of the issue of whether a strike or work stoppage violates an express or implied no-strike clause does not entitle the employer to *Boys Market* injunctive relief; there must be an underlying arbitrable grievance. *See Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n.*, 457 U.S. 702, 722, 102 S.Ct. 2672, 2685, 73 L.Ed.2d 327 (1982).

██ There is a strong presumption in favor of arbitrability especially where, as here, there is a broad arbitration clause.[3] The Supreme Court stated in *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584–585, 80 S.Ct. 1347, 1354, 4 L.Ed.2d 1409 (1960) that "[i]n the absence of any express provision excluding the particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where . . . the arbitration clause [is] quite broad."

██ Defendants contend that before a *Boys Market* injunction may issue, the employer must also allege and prove its willingness to arbitrate. But neither the Supreme Court nor the Court of Appeals for the Third Circuit has directed that the employer prove this as a prerequisite to a *Boys Market* injunction. Absent such direction, this court declines to import such a requirement. *See Jacksonville Maritime Ass'n. v. Int'l. Longshoreman's Ass'n.*, 571 F.2d 319, 324 (1978).

---

**2.** Title 29 U.S.C. § 142(2) defines a strike as including any "concerted stoppage of work by employees . . . and concerted slow down or other concerted interruption of operation by employees."

**3.** *See* Joint Exhibit 1, Section 5.

In *Carbon Fuel v. United Mine Workers of America,* 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1974), the Supreme Court held that the international union could not be held liable for the acts of its local union where it did not investigate, support, ratify or encourage an unauthorized strike. The Agreement in *Carbon Fuel* did not expressly impose an affirmative obligation on the union to prevent and/or halt a strike or work stoppage. The Court refused to imply such a requirement; the union had negotiated the deletion of a provision contained in the prior Agreement which required the union to "maintain the integrity of this contract and to exercise their best efforts through available disciplinary measures to prevent stoppages of work by strike...." 444 U.S. at 219–220, 100 S.Ct. at 415.

Here, unlike *Carbon Fuel,* the Agreement expressly imposes an affirmative obligation on the union to prevent unlawful work stoppages by its members. Section 19 of the Agreement provides:

A Publisher shall not lock out the Union or its members and Newspaper & Magazine Employees Union *shall not permit* any member of members to engage in any strike, boycott, work stoppage or slowdown or to aid or encourage directly or indirectly such action against any newspaper party to this contract. It is further agreed that the validity and execution of this contract and scale will not be dependent upon or affected by the obligation of either party to any other person or organization not a party to this Agreement. (Emphasis supplied).

■ But even in the absence of an affirmative obligation on the Union to prevent and/or halt work stoppages, the absence of *direct* evidence of union ratification, sponsorship or encouragement would not preclude a finding of union culpability. As Justice Powell stated in his concurrence in *Complete Auto Transit, Inc. v. Reis,* 451 U.S. 401, 418 n. 1, 101 S.Ct. 1836, 1846 n. 1, 68 L.Ed.2d 248 (1981), "strike encouragement sometimes is explicit but more often is cryptic. A union may employ subtle signals to convey the message to strike. One court noted that unions sometimes employ 'a nod or a wink or a code in place of the word strike.'" (Citation omitted). This applies even more to union conduct of a work stoppage or slow down than it does to a strike.

In *Seattle Times v. Seattle Mailers Union No. 32,* 664 F.2d 1366, (9th Cir.1982), the newspaper initiated an action for damages allegedly caused by a work slow down by the union in breach of their collective bargaining agreement. After the newspaper installed new machinery to help assemble the Sunday Edition's "color book," (there including the comics, TV Guide, Ad supplements and magazines), the newspaper management eliminated an evening shift and production dropped dramatically. The Court of Appeals held that the trial court's finding the employees engaged in a work slow down not clearly erroneous and that the slow down, if encouraged by the union, was a violation of a contractual obligation implied by an agreement not to strike. The record there did not establish that the union initiated the slow down but it was held sufficient to conclude that the union ratified or authorized the slow down which in itself supported a finding of union responsibility. The evidence that the union supported, ratified or encouraged the work slow down included a statement by the union's Chapel Chairman (Shop Steward) that there was going to be trouble from the change, a union official's request that a supervisor stop harassing the members, trouble with machine operation when union officials were in the vicinity, the union's denial there was a slow down and the resumption of normal production following a TRO.

■ A no-strike and/or no-work stoppage clause can be violated by a mass exercise of individual privileges. In *Elevator Manufacturers Assoc. of N.Y., Inc. v. Local 1,* 689 F.2d 382 (2d Cir.1982), the employer contended that the concerted refusal of its employees to sign up for overtime pursuant to union direction constituted a strike; the court held that the strike

arose out of the underlying arbitrable issue of how the company assigned overtime work so that an injunction could issue if otherwise warranted. It was argued that since no employee was required to sign up for overtime, concerted refusal to do so was not a "strike." The court held that even if an employee had no individual obligation to volunteer for overtime, where the contract leaves the matter to the individual employee uninhibited by union demands or concern, a concerted refusal to perform "voluntary" overtime amounts to a "strike" as defined by the National Labor Relations Act, 29 U.S.C. § 142(2). The court cited *AVCO Corp. v. Local No. 787*, 459 F.2d 968 (3d Cir.1972), which held that a union resolution successfully discouraging overtime work constituted a violation of the collective bargaining agreement's provision mandating, "that there shall be no strikes, walk-outs, sit-downs, production retardings, or similar interruptions of, or interferences with, work...." 459 F.2d at 974. "[T]he resolution discouraging such overtime work is clearly an attempt by the union to retard production, or to interfere with work." *Id.*

The issue presented to this court is whether the mass exercise of the right to change job assignments in accordance with contractual seniority and priority rights under Section 12 of the Agreement was an individual exercise of a right unlimited as to the number of union members who might exercise it or was a concerted union effort to achieve a work stoppage over an arbitrable issue.

PNI contends that on April 23, 1986 shortly after midnight and the same day at about 7:30 a.m., there was a slow down achieved by concerted exercise of a right to change job assignment under Section 12 of the Agreement[4] and that the slow down was in violation of Section 19 of the Agreement.[5]

Section 12 of the Agreement provides that regular mailers are given preference over extra mailers in work assignments which they are competent to perform. If a regular mailer is given a job assignment and prefers a position held by an extra mailer, the regular has the "right to bump" the extra and perform that assignment instead. The preferential right is not a job seniority provision among regular mailers and is limited to positions held by outside extra mailers. The only other stated limitation is that, "[i]t is not intended that a succession of changes be made...."

On April 22, 1986, job assignments were made between 10:00 and 10:30 p.m. as usual. At about midnight, every (or virtually every) regular mailer (approximately 75) exercised his right to bump regardless of assigned position. (Testimony of T. Murphy; Testimony of Sanders).[6] At about 7:30 a.m. that same day, every (or virtually every) regular mailer exercised

---

**4.** Section 12 of the Agreement, in pertinent part, provides:

Mailers on the priority list will be given preference over extra mailers in work assignments which they are competent to perform. It is not intended that a succession of changes be made where a preferential claim is recognized by the Employer. Any problems arising from the application of this practice shall be referred to the Grievance Committee for processing. The parties do not intend the foregoing to be a job seniority provision among the men on the priority list to select positions not held by outside extra mailers. It will not be applicable to the filling of vacant situations or of new situations. It does not create any preferential rights as among mailers on the priority list except as to their right over the positions held by outside extra mailers. In the future selection of men for specific assign-

ments, consideration will be given to men with seniority.

**5.** PNI contended also that there was sabotage of company equipment by some of the mailers on April 23, 1986. There is no direct evidence of sabotage. There is conflicting evidence as to the cause of the equipment failures on April 23, 1986 so that the court cannot on the state of the record conclude that there was sabotage. But such a finding is unnecessary to determine that an injunction should issue. If the employer believes there was sabotage, it is not precluded from filing a grievance.

**6.** There is no transcript from the hearing held in this matter on April 30 and May 1, 1986; supporting testimony is indicated by the name of the witness in parenthesis.

the right to bump regardless of assigned position. (Testimony of Fitzgibbons).

As a result of the concerted exercise of bumpting rights, there was a slow down in production on the night shift (Testimony of Sanders) and on the day shift (Testimony of Fitzgibbons). The slow down was attributable to:

1. The time expended to make the requested changes in assignments. On the night shift it took approximately 45 minutes to make these changes. (Testimony of Sanders).

2. Regular mailers hand stuffing inserts did so at a rate slower than the task is usually performed. (Testimony of Rilea; Testimony of Seidman).

3. Inexperienced extra mailers performed the more sophisticated jobs ordinarily performed by regular mailers. (Testimony of Sanders; Testimony of Seidman). For example, the luggers, who operate the power jacks, operated them at about half-speed. (Testimony of Sanders).

■ Defendants contend that even if there were a mass exercise of the bumping rights, it was not a violation of the Agreement. The Union relies on the fact that whatever the other limitations on bumping rights, Section 12 imposes absolutely no limit on the number of regular mailers who may exercise bumping rights on any shift. The employer concedes there is no numerical limitation on individuals who may exercise bumping rights but contends that this lack of limitation cannot justify concerted action to effect a work stoppage or slow down for reasons other than personal preference. The extensive bumping on April 23, 1986 was not the result of a coincidence of individual mailers expressing personal preferences but was a preconceived plan to exercise this right in concert to effect a work slow down or stoppage in violation of Section 19 of the Agreement.

1. The extensiveness of the bumping was admittedly unprecedented. (Testimony of T. Murphy). Bumping is very rare; on average, only one or two mailers on a given shift choose to bump. (Testimony of Sanders).

2. Some regular mailers are assigned to priority positions reflecting their seniority. The five priority positions are: blotter, computer, office, platform and mail leader. Even those regular mailers who were assigned priority positions on April 23, 1986 chose to bump and perform the less-desirable job of insert stuffing.

3. Mailers bumping from priority positions had admittedly never done so before. (Testimony of T. Murphy).

4. The list presented to management was pre-considered. Thomas Murphy's explanation of how he prepared the list of names of mailers who wished to bump on the midnight shift was incredible.

5. Job assignments on the night shift are ordinarily handed out at approximately 10:00 p.m. Those mailers who wish to bump usually inform the foreman or a union representative at that time. On April 22, 1986, no one requested a different assignment when the assignments were distributed. Only at approximately 12:15 a.m. after the presses were started, was a handwritten list of those who wished to bump presented to the Night Foreman. (Testimony of Sanders).

The work slow down arose out of a dispute concerning a management change in operational practice in mailroom preparation of the advance section portion of the Sunday *Inquirer*, *i.e.*, a split comic section, in connection with changes in automated equipment; the change was allegedly made without proper prior notice.

1. On Saturday, April 19, 1986, having been advised that the President of the Union, Edward Savryk, wished to speak with him, Glen Nardi, Production Director at PNI, called Savryk. Savryk was agitated over the company's intention to split the preparation of the advance section of the Sunday *Inquirer* the following week. He said he had not understood that to be the company's intention when split sections were discussed at prior meetings. Nardi suggested a meeting on Monday, April 21,

1986 to discuss the problem. (Testimony of Glen Nardi).

2. August Ober, mailroom manager, received a call from Savryk on Saturday, April 19, 1986; Savryk told Ober that he had not agreed to split production of the comic section of the Sunday *Inquirer* so soon. (Testimony of August Ober).

3. Stanley Seidman, a mailroom foreman, also received a call from Savryk on April 19, 1986; Savryk wanted to know whether the company intended to split the production of the comic section of the Sunday *Inquirer* the following week. Seidman told Savryk that was the company's intention and that Nardi had informed the union of this at the meeting held on Wednesday, April 16, 1986. Savryk said he had not agreed to it. (Testimony of Seidman).

4. A meeting between management and the Union was held on Monday, April 21, 1986 to discuss the production of the advance section. Savryk's position was that the decision to split production of the comics at this time was an arbitrary decision that the company could not make unilaterally. The attorney for the Union said it was the company's responsibility to sit down and discuss the matter with the Union before making the change. The company's position was that there was proper notice: the February meeting and the meeting on April 16, 1986. (Testimony of Nardi).

5. At or about 3:30 a.m. on April 23, 1986, the day of the slow down, Rilea, Vice-President of Labor Relations, met with Gough, a mailer and assistant Chapel Chairman of the Union. Gough told Rilea that if the company would sit down with the Union and discuss the split comic sec-

tion, the situation would be resolved quickly. (Testimony of Rilea).

It is undisputed that no high ranking Union official made any personal effort to stop the slow down; Savryk testified that he believed the mailers had the right to engage in mass bumping regardless of the work slow down. Therefore, the Union breached its contractual obligation to halt the slow down. Moreover, there is sufficient evidence of record for the court to draw an inference of Union sponsorship and/or ratification.

1. At or about 3:30 a.m. on April 23, 1986, the day of the slow down, Gough, a PNI mailer and assistant Chapel Chairman of the Union, told Rilea, Vice-President of Labor Relations, that if the company would sit down and discuss the split comic section of the Sunday *Inquirer*, the situation would be quickly resolved. (Testimony of Rilea).[7]

2. A meeting was held on April 23, 1986 at approximately 1:30 p.m. The Union's position at the meeting was that it did not understand what was going on with the Sunday comics; the company could not make such a change unilaterally. A second meeting was scheduled for Thursday, April 24, 1986. The Union wanted an agreement as to the agenda for that meeting. It was agreed that among that which would be discussed was when the split production of the comic section would begin. Savryk said that he would inform the members of the Union of the agenda and that the company would see a marked improvement. (Testimony of Rilea).

3. There was no mass bumping after the Thursday meeting was scheduled. (Testimony of Rilea).

**7.** The Union apparently contends that the comment of Gough is not binding on the Union because only Savryk, the President, could speak for it. This argument fails to distinguish two issues: what is the motive or intent of the Union members in exercising bumping rights under Section 12, and whether the Union instagated, ratified or authorized the mass bumping that occurred. On the former issue of motive or intent all evidence of conduct or statements by any Union member is relevant whether or not he is an officer or member of the executive

committee. On the latter, President Savryk's contention that only James Hart, Jr. (who was hospitalized) and himself could speak for or act for the Union was absurd. Even if Gough as a member of the Executive Committee had no such right, it is clear under the Union laws that the Vice-President performs all the duties of President if he refuses to attend to them; Laws, p. 4. But here the conduct of the President alone is sufficient to warrant an inference of Union authorization and ratification of this work slow down.

4. Savryk testified at the hearing the Union was upset about the company's intention to split the production of the comics the following week; the Union believed the change in production was not to occur until Memorial Day; the Union had not received adequate notice of the imminent change; and the change might affect the distribution and availability of mailroom jobs.

Section 5 of the Agreement provides that the mandatory grievance-arbitration procedure applies to all disputes "which may arise as to the construction, interpretation, application or execution of this agreement...." Whether or not Section 12 permits mass bumping for other than personal preference is an arbitrable dispute. But the underlying dispute giving rise to the work slow down involves the "construction, interpretation, application or execution" of Section 6 of the Agreement; that dispute is arbitrable under Section 5 and under Section 6 itself.[8]

A related case was filed on March 21, 1986. The plaintiff, PNI, sought an injunction against some of these defendants—The Newspaper & Magazine Employees Union, Union officials, and members of the union—as a consequence of a work stoppage on March 17, 1986 at the same plant in connection with the production of the *Daily News.* The work stoppage was approximately 30 minutes in duration. Defendants did not deny a work stoppage but argued that the work stoppage was a safety measure justified under *Gateway Coal Co. v. United Mine Workers,* 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974) (if the union presents ascertainable objective evidence of an abnormally dangerous working condition, an injunction pending arbitration can issue only if the unsafe condition is corrected). Safety concerns involving the area known as Track 6 were brought to the court's attention. On March 22, 1986, the court viewed PNI's plant in order to understand the evidence presented at the hearing that followed. The court concluded that the grievance did not concern dangerous working conditions but that the work stoppage resulted from a manning dispute concerning the installation of new mailroom equipment. *Gateway Coal* did not apply and a *Boys Market* injunction issued.

The instant case was correctly assigned to this judge as related to the prior case. "Civil cases are deemed related when a case filed involves the same issue of fact or grows out of the same transaction of another suit...." Local Rule 3(b)(3)(A). Although the prior case involves the *Daily News* and this case the *Inquirer,* both cases involve: (1) the same union; (2) the same plant; (3) the same group of employees, mailers; and (4) essentially the same underlying dispute, that is, changes in production in connection with changes in automated equipment, the notice of changes required, and the effect of these changes on Union jobs. (Testimony of Savryk).

■ The court having found the work slow down is in violation of a no-strike clause of the Agreement over an issue the parties have agreed to arbitrate, a preliminary injunction must issue, if warranted under ordinary principles of equity. These are: (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) the movant will suffer irreparable

---

**8.** Section 6 of the Agreement, in pertinent part, provides:

If the Employer, as a result of the installation of new machinery, contemplates a substantial or major change in the present operational practice of the Mail Room involving the number of men flying a press or working on inserting machines or tying machines or working on a conveyor belt or shipping platform or stencil room, the Publisher agrees that he will first communicate with the Union representatives in writing via Registered Mail at least ninety (90) days in advance of the date set for the contemplated change and advise the Union of his intention and all details of such contemplated change as are then available including the estimated date of installation or contemplated change.

The Union may proceed to arbitration on any question or questions which may be in dispute as a result of the contemplated change or changes and the procedures to be followed in such event shall be that set forth in Section 5 hereof provided, however, that upon the written request of the Union, the Joint Standing Committee shall be waived and the dispute may proceed directly to arbitration....

harm unless the injunction issues; (3) greater injury would be inflicted upon the movant by denial of injunctive relief than will be inflicted upon defendants by the granting of such relief; and (4) the injunction is in the public interest.

The substantial likelihood that the movant will ultimately prevail on the merits is evident from the court's findings and previous discussion.

The movant will suffer irreparable harm if the injunction does not issue. There is a presumption of irreparable harm:

> While it is of course true ... that other avenues of redress, such as an action for damages, would remain open to an aggrieved employer, an award of damages after a dispute has been settled is no substitute for an immediate halt to an illegal strike.

*Boys Market, supra* at 248, 90 S.Ct. at 1591. But even if there were no presumption, the testimony on behalf of PNI clearly established that this continuing work slow down will cause substantial, immediate and irreparable harm to the plaintiff in terms of long-term and short-term loss of advertisers and subscribers in addition to the damage already suffered by the loss of production occasioned by the work slow down of April 23, 1986.[9]

Defendants contend that the company is not entitled to an injunction because the company had a right to deny the requested changes in job assignments if those requesting were not competent and having failed to do so cannot now grieve. Section 12 provides that regular mailers will be given preference over extras in work assignments for which they are competent. But the problem here is not only the competence of the regulars to perform work of extras but the competence of their replacements to perform their original work assignments. Whether PNI could have denied the mass exercise of bumping rights

on the ground of the competence not of the regulars but of the extras is not clear from the Agreement and would, of course, be arbitrable. The employer reasonably feared a walk out if permission were withheld so that it was reasonable for it to accommodate the requests when faced with the prospect of incalculable losses from a stop in production. The company brought this action only after it subsequently realized that the slow down was actually a manning dispute under Section 6 and related to the prior dispute.

Greater injury would be inflicted upon plaintiff by denial of injunctive relief than will be inflicted upon defendants by granting such relief. While PNI will suffer irreparable harm if the injunction does not issue, the injury inflicted on the defendants as a result of the injunction is slight. Individual employees will still be able to exercise a contractual right to change job assignments. What the Union and its members may not do is engage in a concerted change in job assignments to protest or impede proposed changes in equipment by work stoppage or by slow down (pending arbitration on this issue).[10]

Finally, granting the injunction is in the public interest; encouraging peaceful settlement of disputes through arbitration procedure is consistent with our national labor policy.

Defendants contend that an injunction is not appropriate because: (1) there has been only a single instance complained of that is unlikely to reoccur; and (2) if mass bumping were attempted and refused by PNI, the Union would then resort to the grievance-arbitration procedure. But the Union's conduct with regard to use of equipment in preparation of the *Daily News* and then with regard to use of equipment in preparation of the advance section of the Sunday *Inquirer* makes clear there is an underlying and continuing dispute over me-

---

9. Because it was not admitted in evidence, whether or not it may have been admissible, the Order by Consent dated October 6, 1975 has not been reviewed or considered in deciding the issues before this court.

10. Whether the mass exercise of bumping rights is protected activity under Section 12 is arbitrable under Section 5 and under Section 12 by its own terms.

chanization and manning; work disruptions will continue unless and until the underlying dispute is referred to arbitration in accordance with the Agreement and the underlying dispute resolved.

The company is not required to stand by as the Union engages in one ruse or another to avoid the no-strike, no work stoppage, no work slow down provisions of the contract. The Agreement negotiated by the parties provides for good faith endeavors by both parties to settle all questions under the Agreement or side letters of agreement by amicable discussion and arbitration not guerilla warfare. No party is prejudiced by an order compelling compliance with the grievance procedure expressly bargained for by the employer and the Union. While either party could file a grievance under the facts found herein, the court upon consideration of the record as a whole believes it is the Union that should be required to initiate the grievance. Articulating the Union's real concerns with specificity will aid in resolving the dispute in the manner contemplated by the Agreement.

Therefore, an injunction must issue compelling speedy utilization of the grievance procedures provided for by the Agreement or waiver of objections to the mailroom equipment installation, including the new Track 6 IDAB Bundle Handling System, the reduction in the manpower levels required to process PNI publications and changes in the method of making up and dispatching the PNI Sunday package, and all other matters covered by the PNI letter to the Union, dated November 2, 1984.

The Preliminary Injunction entered herein differs from the permanent restraining order entered on March 24, 1986 in four other respects:

1. The United States Marshal is not ordered to enforce the Order as there seems no need for such a provision in the absence of reason to believe the defendants will violate an injunction if issued;

2. The parties are ordered to arbitration within thirty (30) days with a formal report to the court within sixty (60) days. The defendant Union is ordered to initiate the grievance procedure to enable a clear articulated statement of the issues regarding institution of changes in mailroom operation, manpower levels required to process and insert PNI publications and changes in the method of making up and dispatching the Sunday package. A joint report within sixty (60) days is required to assure the court that the underlying issues will be dealt with as contemplated by the collective bargaining process and not by continued resort to this court.

3. The parties as named in the complaint differ slightly; in each instance, the Union President and Vice-President are named but two individuals previously named are not defendants herein and three defendants in this action have not previously been named defendants. James Hart, Jr. is named in the complaint but not in the Order because Mr. Hart, hospitalized for a heart ailment, did not participate in the events in suit.

4. This preliminary injunction is more narrowly drawn to make explicit the understanding of the parties that they are permanently enjoined and restrained not from any and all strikes, stoppages, slow downs, etc., but only those caused by the dispute under Sections 6 about changes in manpower levels required to process and insert PNI publications and changes in the make-up and dispatch of the Sunday package. It was clear in context that the prior order was limited to disputes under Section 6 of the Agreement and certain side letter agreements with regard to reduction in manpower levels required to process the *Daily News*. In the discussion of the wording of the preliminary injunction that followed the court's bench opinion of March 24, 1986, the arguments of counsel were directed to whether or not the injunction would cover all publications or only the *Daily News*. Defense counsel failed to object to the absence of limiting language with regard to the restrained activity. If not waived, the limiting language should have been included. However, because that order is presently on appeal, the court may lack jurisdiction to modify it; *but see*

*Venen v. Sweet*, 758 F.2d 117, 120 n. 2 (3d Cir.1985) (a district court during the pendency of an appeal is not divested of jurisdiction to modify an injunction). Either party may move in the Court of Appeals for a remand to this court to permit narrowing and clarification of the restraining order. This court will also consider a request of either party for such modification after giving both parties an opportunity to be heard.

All facts referred to in this discussion shall be deemed incorporated in the court's specific Findings of Fact.

### Conclusions of Law

This court has jurisdiction over the parties and the subject matter.

On April 22 and 23, 1986, defendants utilized a concerted exercise of bumping rights under Section 12 of the Agreement as a pretext for an intentional work slow down regarding a dispute as to Section 6.

This work slow down concerned a management change in operational practice in mailroom preparation of the advance portion of the Sunday *Inquirer, i.e.,* a split comic section, in connection with changes in automated equipment, allegedly without proper prior notice; this change effected work patterns for members of defendant Union.

This work slow down was related to a work stoppage last month regarding the preparation of the *Daily News* over similar manning issues in connection with changes in the automated equipment in the mail room, also allegedly without proper notice; Civil Action No. 86–1637.

This work slow down was in violation of Section 19 of the Agreement.

This work slow down was over a grievance arbitrable under Section 5 and Section 6 of the Agreement.

Both parties are contractually bound to arbitrate the underlying grievance causing the work slow down and the employer is ready and willing to do so.

There is a substantial likelihood that the employer will prevail on the merits of the disputes relevant to the issues before this court.

Unless defendants are enjoined from concerted action to effect a work stoppage pending arbitration of the underlying grievance, plaintiffs will suffer immediate, substantial and irreparable harm.

Plaintiffs will suffer greater injury from denial of relief than defendants will suffer by being enjoined from violating the Agreement they negotiated with PNI and being compelled to comply with its grievance procedure.

An injunction under the facts found herein is in the public interest.

### MEMORANDUM OF DECISION

Pending before this court is plaintiff's motion for preliminary injunction to enjoin defendants from obstructing justice in violation of 18 U.S.C. § 1503 and 1513. This is the second motion for a preliminary injunction in this matter.

On April 23, 1986, plaintiff filed a complaint for a preliminary and permanent injunction restraining defendants from engaging in a work slow down in violation of the Collective Bargaining Agreement (the "Agreement") between the parties. A stand-still agreement pending a hearing on a preliminary injunction made it unnecessary to consider plaintiff's motion for a temporary restraining order filed concurrently with the complaint. On May 7, 1986 following a hearing held on April 30, and May 1, 1986, a preliminary injunction issued. The court concluded that the defendants had breached the no-strike clause of the Agreement (Section 19) by engaging in a wilful and deliberate slow down by concerted exercise of the right to change job assignments ("bumping") under Section 12 of the Agreement and that the slow down was over an arbitrable issue, a management change in operational practice in the mailroom preparation of the advance portion of the Sunday *Inquirer* in connection with changes in automated equipment. The issue was arbitrable under Section 5 and Section 6 of the Agreement; the change allegedly was made without proper

notice to the Union. On June 2, 1986, defendants filed a notice of appeal to the Court of Appeals for the Third Circuit.

At the hearings on the preliminary injunction, Thomas Sanders, General Foreman of the Philadelphia *Inquirer* mailroom, testified on behalf of PNI as to the events of April 23, 1986, the day of the slow down. His testimony as to the circumstances of the mass exercise of bumping rights was relevant to the court's determination that an injunction should issue; his testimony was cited in the court's Memorandum of May 7, 1986.

On July 1, 1986, PNI filed this motion for preliminary injunction seeking to enjoin the defendants from instituting, processing, or in any manner continuing retaliatory internal disciplinary procedures against Thomas Sanders as a result of his testifying on behalf of PNI and to expunge and rescind any such action already taken. On July 25, 1986, defendants filed a motion to dismiss and/or deny plaintiff's motion for a preliminary injunction. On August 15, 1986, the court heard oral argument on both motions and ruled from the bench. This Memorandum states the court's reasons for denying both motions.

The facts material to the pending motions are not in dispute. On May 27, 1986, defendant Union hand delivered to Thomas Sanders a letter dated May 23, 1986, from Union President Edward Savryk that informed Sanders that he had violated Section 70 of the Union's laws by inferentially by testifying against the Union, *inter alia,* and directing him to appear at a meeting of the Union's Executive Board on May 29, 1986. Sanders did not attend the meeting.

On May 30, 1986, defendant Union hand delivered to Sanders another letter informing him that as a result of his failure to attend the meeting as he had been directed, the Board had unanimously recommended that he be fined $50.00.

On June 8, 1986, defendant Union delivered to Sanders a third letter informing him that the Union membership, upon the recommendation of the Union's Executive Board, had voted to fine him $50.00. The

letter stated that "unless said sum is paid within the next thirty (30) days, appropriate action will be taken." Sanders paid the fine.

Plaintiff contends that the Union's institution of disciplinary proceedings against Sanders immediately after and as a consequence of his testimony in the proceedings before this court constitutes an "indirect contempt of court" in violation of 18 U.S.C. § 1503 and 18 U.S.C. § 1513.

Title 18 U.S.C. § 1503 provides:

Whoever ... corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs or impedes or endeavors to influence, obstruct or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years or both.

Title 18 U.S.C. § 1513 provides:

(a) Whoever knowingly engages in any conduct and thereby ... damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for

(1) the attendance of a witness or party at an official proceeding, or any testimony given or any record, document or other object produced by a witness in an official proceeding; ... or attempts to do so, shall be fined not more than $250,000 or imprisoned not more than ten years, or both.

This proceeding is not and cannot be a proceeding in criminal contempt. It is not movant's role to enforce the criminal laws. This court could summarily punish a contempt of court in its presence but movant concedes defendants have not violated any order of this court. Neither is this a proceeding for coercive civil contempt sanctions or for compensatory civil contempt damages. Plaintiff's request for injunctive relief is in effect incident to a separate action for defendants' denying it access to court. But properly pleaded, it would have been assigned to this judge as related to

Civil Action No. 86–2342. Therefore, the court heard argument on the motions.[1]

The Union contends that the court lacks jurisdiction to issue the injunction because the conduct complained of alleges an unfair labor practice of which the National Labor Relations Board ("NLRB") has exclusive jurisdiction. On June 6, 1986, plaintiff did file with the NLRB a complaint charging an unfair labor practice in violation of 29 U.S.C. § 158(b)(2)(B) (making it an unfair labor practice for a labor organization or its agents to "restrain or coerce ... an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances."). The complaint filed with the NLRB is predicated upon the same conduct underlying the instant motion for preliminary injunction, that is, the institution of disciplinary proceedings against Thomas Sanders by the Union after he testified for PNI against the Union.

■ As a general rule, the NLRB has exclusive jurisdiction to determine what is and what is not an unfair labor practice. 29 U.S.C. § 160; *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 83, 102 S.Ct. 851, 859, 70 L.Ed.2d 833 (1982); *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1979); *Moldovan v. Great Atlantic & Pacific Tea Co., Inc.*, 790 F.2d 894, 900 (3d Cir.1986). However, it is also well-established that a federal court may decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies laws. *Connell Construction Co. v. Plumbers and Steamfitters Local Union No. 100*, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). There, petitioner filed suit claiming that an agreement between it and respondent union violated Sections 1 and 2 of the Sherman Act. Respondent contended that the agreement was exempt from the antitrust laws because it was authorized by Section 8(e) of the National Labor Relations Act ("NLRA"). The Court of Appeals, refusing to decide whether 8(e)

permitted the agreement or whether the agreement constituted an unfair labor practice under 8(e), held that the NLRB had the exclusive power to decide those issues. The Supreme Court reversed on the ground that "the federal courts may decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies including the antitrust laws." *Id.* at 626, 95 S.Ct. at 1837.

■ Here, plaintiff is not asking the court to find the defendants have committed an unfair labor practice. The issue before the court is not one of labor law. Whether defendants committed an unfair labor practice will not be decided by this court; the labor law issue is collateral to plaintiff's motion brought pursuant to an "independent federal remedy." Federal labor law does not preempt the application of all federal criminal or civil law. *See Altemose Construction Co. v. Building & Construction Trades Council*, 751 F.2d 653 (3d Cir.1985), *cert. denied*, — U.S. ——, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986).

Even if the issue before the court were one of labor law, the court would not necessarily be divested of jurisdiction. The exclusive competence of the NLRB to decide whether conduct constitutes an unfair labor practice does not apply when the conduct in question also constitutes a breach of the Agreement. Federal and state courts have jurisdiction to hear claims brought for violation of contracts between an employer and a labor organization under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. In *William E. Arnold v. Carpenters*, 417 U.S. 12, 94 S.Ct. 2069, 40 L.Ed.2d 620 (1974), the Supreme Court upheld the jurisdiction of a state court to issue an injunction enjoining a strike in violation of a no-strike clause contained in the collective bargaining agreement, notwithstanding that the strike was arguably an unfair labor practice under 29 U.S.C. § 158(b)(4)(i)(D).

1. Of course, if the scope or meaning of a court order were at issue, then another judge would have had to dispose of the motions. But that does not appear to be the issue.

Here, while defendants' conduct arguably constitutes an unfair labor practice under 29 U.S.C. § 158(b)(1)(B), it also arguably constitutes a breach of the Agreement. This is because the conduct at issue is viewed by plaintiff as a continuation of the conduct enjoined by the court to permit arbitration under the Agreement. Because an appeal was taken from the preliminary injunctive relief granted May 7, 1986, Civil Action No. 86–2342 remains open on this court's docket pending final relief. For all the foregoing reasons, this court is not divested of jurisdiction to decide whether the requested injunction shall issue on the ground defendants' conduct arguably constitutes an unfair labor practice.

Nor does the pendency of the appeal in this matter divest the court of jurisdiction with regard to plaintiff's motion "[A]s a general rule, the timely filing of a notice of appeal is an event of jurisdictional significance, immediately conferring jurisdiction on a Court of Appeals and divesting a district court of its control *over those aspects of the case involved in the appeal.*" *Venen v. Sweet,* 758 F.2d 117, 120 (3d Cir.1985) (citing *Griggs v. Provident Consumer Discount Co.,* 459 U.S. 56, 58, 103 S.Ct. 400, 401, 74 L.Ed.2d 225 (1982)) (emphasis supplied). Here, whether the Union's institution of disciplinary proceedings against Sanders to retaliate for his testifying against the Union is not an issue on appeal so that the appeal does not divest the court of jurisdiction.[2] Defendant's motion to dismiss is denied.

The problem with plaintiff's motion is not the court's jurisdiction to entertain some action but plaintiff's lack of entitlement to the relief sought. Even if plaintiff is entitled to declaratory relief or damages, an injunction can issue only if the movant establishes: (1) a substantial likelihood that it will ultimately prevail on the merits; (2) it will suffer immediate, irreparable harm unless the injunction issues; (3) greater injury would be inflicted upon the movant by denial of injunctive relief than will be inflicted upon defendants by granting such relief; and (4) the injunction is in the public interest. Even if one accepts everything that PNI contends to be true, an injunction cannot presently issue.[3] For this reason, there was no need for an evidentiary hearing.

By letter dated June 24, 1986, the Union assured Sanders that his payment of the $50.00 fine levied against him closed the matter; as to Sanders, there is no continuing threat. However, he is not precluded from bringing an action for expungement of his record and repayment of the fine imposed and attorneys' fees. *See Strom v. National Association of Basketball Referees,* 564 F.Supp. 250 (E.D.Pa.1983), *aff'd,* 732 F.2d 147 (3d Cir.1984).

Plaintiff contends that the injunctive relief sought is necessary so that other Union members will not be deterred from testifying for it in this and any future proceeding. But there is no imminent future proceeding so that there can be no immediate irreparable harm. There is no assertion that the pending arbitration proceedings are hampered by the unavailability of testimony from union members.[4] An unfair labor

---

**2.** Nor does the pendency of appeal relieve the parties of their obligation to comply with the court's Orders. It is long-established that "an Order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings." *United States v. United Mine Workers of America,* 330 U.S. 258, 293, 67 S.Ct. 677, 696, 91 L.Ed. 884 (1946). Violation of a court Order is punishable as criminal contempt even if the Order is subsequently set aside on appeal. *Id.* at 294, 67 S.Ct. at 696.

**3.** Neither party has addressed the power of the court to enjoin the commission of a crime. *See*

*United States v. Jalas,* 409 F.2d 358, 360 (7th Cir.1969) (court lacks power absent national emergency, widespread public nuisance or specific statutory grant of power). However, the court need not resolve this issue since under the circumstances, an injunction cannot issue in any event.

**4.** The issues the parties have agreed to arbitrate are summarized in the Formal Report to the Court filed July 8, 1986 (Paper Filed # 19); see Richard Meyer's letter of June 23, 1986 to Arthur Mehr, Director, American Arbitration Association. The court's Order of May 7, 1986 required defendants within thirty (30) days of that

practice charge is pending before the NLRB. The availability of other remedies also argues against the necessity for immediate, preliminary injunctive relief. Plaintiff's motion for preliminary injunction is denied. The court's ruling is without prejudice to a court order pursuant to the All Writs Act, 28 U.S.C. § 1651, to protect witnesses in any future court or court-ordered proceeding if necessary. The court's expresses no view whether plaintiff and/or Sanders may now or later file an action for damages or declaratory relief under 29 U.S.C. § 185, 42 U.S.C. § 1985(2) or 18 U.S.C. §§ 1961–8 and perhaps obtain preliminary relief as an incident thereto in some circumstances. *See Malley-Duff & Associates, Inc. v. Crown Life Insurance Co.*, 792 F.2d 341, 355 (3d Cir.1986). If such a lawsuit is commenced, it should be filed related to Civil Action No. 86–2342 under Local Rule 3.

Finally, because it is alleged that the Union has obstructed justice in violation of 18 U.S.C. §§ 1503 and 1513, the court's duty is to refer this matter to the United States Attorney for further investigation.

## ORDER

AND NOW, this 25th day of August, 1986, upon consideration of plaintiff's motion for preliminary injunction and defendants' motion to dismiss, following argument held and a decision from the Bench on August 15, 1986, it is ORDERED that the motions have been denied for the reasons set forth in the foregoing Memorandum, it is ORDERED that the motions are DENIED.

date to initiate the procedure provided for by Section 5 of the Agreement to resolve the grievance over which the slow down occurred. However, defendants admittedly did not comply with the court's Order because they believed the court's Memorandum and Order of May 7, 1986 were in error, that is, that the dispute giving rise to the slow down was not arbitrable. The Union concedes that as a result it has waived the right to arbitrate said issue.