203 F.3d 703 (9th Cir. 2000)
 BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY; SANTA FE RAILWAY COMPANY, Plaintiffs-Appellees,
v.
INTERNATIONAL BROTHERHOOD OF TEAMSTERS LOCAL 174, an OPINION unincorporated association; ROBERT A. HASEGAWA, an individual; ERIC SMITH, Defendants-Appellants.
 No. 97-35859
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted May 4, 1998
Opinion Decided March 16, 1999
Withdrawn and Rehearing En Banc Granted August 27, 1999
Argued and Submitted on Rehearing October 21, 1999
Decided February 15, 2000
As Amended on Grant of Modification March 8, 2000
 
 [Copyrighted Material Omitted]
 COUNSEL: Roy T. Englert, Jr., Mayer, Brown & Platt, Washington, D.C. (argued); and Michael R. Rayton, Ryan, Swanson & Cleveland, Seattle, Washington, (brief) for the plaintiffs-appellees.
 Dmitri Iglitzin, Schwerin, Campbell & Barnard, Seattle, Washington (argued); Jonathan P. Hiatt, Washington, D.C., Earl Brown, Washington, D.C., and Marsha S. Berzon and Scott A. Kronland, of Altshuler, Berzon, Nussbaum, Berzon & Rubin, San Francisco, California (briefs), for the defendants-appellants.
 Donald Munro, Shea & Gardner, Washington, D.C., for amicus Airline Industrial Relation Conference.
 Appeal from the United States District Court for the Western District of Washington; Walter T. McGovern, District Judge, Presiding. D.C. No. CV-97-01052-WTM
 Before: Procter Hug, Jr., Chief Judge, Mary M. Schroeder, Harry Pregerson, Diarmuid F. O'Scannlain, Stephen S. Trott, Pamela Ann Rymer, Michael Daly Hawkins, A. Wallace Tashima, Barry G. Silverman, Susan P. Graber, and M. Margaret McKeown, Circuit Judges.
 PREGERSON, Circuit Judge:
 
 
 1
 This case requires us to decide the breadth of the term "labor dispute" as defined by the Norris-LaGuardia Act, 29 U.S.C. S 101 et seq. The union in this case threatened to picket a railroad unless the railroad agreed to subcontract work only to subcontractors who employ the union's members. We must decide whether the union and the railroad were engaged in a labor dispute. The district court decided that this dispute was not a labor dispute and enjoined the union from picketing. We have jurisdiction under 28 U.S.C.S 1292(a)(1), and we reverse.
 
 
 2
 * Plaintiff-appellee Burlington Northern and Santa Fe Railway Company ("Burlington Northern") is an interstate rail common carrier that operates an intermodal hub in Seattle, Washington. The present dispute arose when Burlington Northern terminated a subcontracting agreement with Eagle Systems, Inc. ("Eagle") for loading and unloading services at the Seattle hub and transferred the work to another subcontractor, Parsec, Inc. ("Parsec"). As a consequence, 53 Eagle employees lost their jobs.
 
 
 3
 Defendant-appellant International Brotherhood of Teamsters Local 174 ("Local 174") represents the Eagle employees who lost their jobs when Burlington Northern transferred the subcontracted work from Eagle to Parsec. Local 174 also represents employees of other subcontractors who continue to perform work under subcontracts with Burlington Northern. Local 174 does not represent any employees of either Burlington Northern or Parsec. A union that is not affiliated with the Teamsters represents the Parsec employees who perform the work formerly done by Eagle employees.
 
 
 4
 Local 174's first response to Burlington Northern's termination of the Eagle contract was to request Burlington Northern's aid in persuading Parsec to hire the former Eagle employees. Burlington Northern refused to arrange a meeting between Parsec and Local 174. Next, Local 174 sent a letter to Burlington Northern, explaining how the transfer of work to Parsec affected its members:
 
 
 5
 It has come to our attention that the Burlington Northern/Santa Fe RailroadCompany at times has chosen to subcontract ramp and deramp work located within the geographical jurisdiction of Inter national Brotherhood of Teamsters, Local 174, to employers who have themselves as of the time of the subcontract not entered into a collective bargaining agreement with Local 174 or otherwise committed themselves to employ Local 174 members to per form work covered by the subcontract. This appears to be the case even though the work covered by these subcontracts has traditionally and consistently been performed by Local 174 members working pursuant to a collective bargaining agreement.
 
 
 6
 Any future use by BNSF of subcontractors who do not have collective bargaining relationships with Local 174 would deprive our members of work tradi tionally performed by members of Local 174's bar gaining units. For this reason, use of such subcontractors by BNSF in the future would impose substantial economic costs and personal hardship on the members of Local 174, including the loss of health, welfare, and pension benefits paid to the Western Conference of Teamsters Pension Fund.
 
 
 7
 Local 174 then requested that Burlington Northern agree not to subcontract any loading and unloading services to any subcontractor that did not have a current collective bargaining agreement with Local 174. Local 174 also threatened to picket in support of this demand. In the letter, Local 174 specifically limited its demand to future subcontracting agreements and disclaimed any intent to force Burlington Northern to terminate existing subcontracting agreements. Robert Hasegawa, Secretary-Treasurer of Local 174, testified that the union's objective in demanding this agreement was to protect "family wage jobs and working conditions" in the area against deterioration.
 
 
 8
 Local 174 never commenced the threatened picketing because Burlington Northern brought this action against Local 174,[1] alleging violations of the Railway Labor Act, 45 U.S.C. S 151 et seq., and federal antitrust laws, 15 U.S.C. S 1 et seq., and seeking injunctive relief.[2] After the suit was filed, Local 174 stipulated to the court that it would refrain from picketing until the court decided Burlington Northern's motion for a preliminary injunction. The district court ruled that the Norris-LaGuardia Act did not bar it from issuing an injunction. The court then issued a preliminary injunction because it believed that Local 174's threatened picketing was "substantially likely [to be] violative of the federal antitrust law." The injunction restrains Local 174 from"[c]alling, ordering, authorizing, encouraging, inducing, approving, continuing, starting, suffering, permitting or carrying out any strike, picket or work stoppage" at Burlington's facilities. On appeal to the Ninth Circuit, a divided three-judge panel affirmed. See Burlington N. Santa Fe Ry. Co. v. International Bhd. of Teamsters Local 174, 170 F.3d 897 (9th Cir. 1999). We vacated the panel's decision and agreed to rehear the appeal en banc.
 
 II
 
 9
 The Norris-LaGuardia Act deprives federal courts of jurisdiction to issue an injunction to restrain peaceful picketing in "any case involving or growing out of any labor dispute." 29 U.S.C. S 104. Norris-LaGuardia defines the term "labor dispute" as
 
 
 10
 any controversy concerning terms or conditions of employment, or concerning the association or repre sentation of personsin negotiating, fixing, maintain ing, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.
 
 
 11
 29 U.S.C. S 113(c). We hold that a dispute between a union and a seclient company (here, Burlington Northern) over whether the client company's subcontractors must employ that union's members is a Norris-LaGuardia labor dispute. Thus, the dispute between Local 174 and Burlington Northern falls squarely behind Norris-LaGuardia's jurisdictional bar, and the district court had no power to enjoin Local 174 from picketing Burlington Northern.[3]
 
 
 12
 * We review de novo a district court's exercise of subject matter jurisdiction. See Hexom v. Oregon Dep't of Transp., 177 F.3d 1134, 1135 (9th Cir. 1999). The existence of a "labor dispute" within the meaning of the Norris-LaGuardia Act is also a question of law that we review de novo. See Smith's Management Corp. v. IBEW, Local 357, 737 F.2d 788, 789 (9th Cir. 1984).
 
 B
 
 13
 Congress enacted the Norris-LaGuardia Act in 1932 to "tak[e] the federal courts out of the labor injunction business." Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n, 457 U.S. 702, 712 (1982). By stripping the federal courts of jurisdiction to enjoin labor disputes, Congress took an "extraordinary step . . . to remedy an extraordinary problem." Burlington N. R.R. Co. v. Bhd. of Maintenance Way Employees, 481 U.S. 429, 437 (1987). The "extraordinary problem" dates back to the final decades of the nineteenth century when federal courts routinely enjoined labor picketing at the behest of employers. See Patrick Hardin, The Developing Labor Law 7 (3d ed. 1992); see also National Woodwork Mfrs. Ass'n v. NLRB, 366 U.S. 612, 620 (1967) (stating that "[f]ederal court injunctions freely issued against all manner of strikes and boycotts under rulings that condemned virtually every collective activity of labor as an unlawful restraint of trade"); see, e.g., Bedford Cut Stone Co. v. Journeyman Stone Cutters' Ass'n, 274 U.S. 37 (1927); Duplex Printing Press Co. v. Deering, 254 U.S. 443 (1921); Gompers v. Buck's Stove & Range Co., 221 U.S. 418 (1911); Loewe v. Lawlor, 208 U.S. 274 (1908); In re Debs, 158 U.S. 564 (1895). This practice was derisively dubbed "government by injunction." Milk Wagon Drivers' Union v. Lake Valley Farm Prods. , 311 U.S. 91, 102 (1940).
 
 
 14
 The popularity of injunctive relief among employers stemmed from its unique effectiveness in stifling labor disputes. In contrast to civil damages or criminal prosecution, preliminary injunctions enabled employers to defeat unions instantly by preventing them from using self-help and destroying the momentum of strikes before substantive legal rights were litigated. "[W]here the substantive law was uncertain, the availability of temporary injunctive relief became more important as a practical matter than the substantive law ultimately applied, since the momentum of a temporarily enjoined strike could not normally be regained even if the injunction ultimately was vacated." Hardin, at 7; see also Allen Bradley Co. v. Local Union No. 3, International Bhd. of Elec. Workers, 325 U.S. 797, 802 (1945) (While"[i]njunctions were used to enforce the [Sherman]Act against unions, . . . employers invoked injunctions to restrain labor union activities even where no violation of the Sherman Act was charged."); F. Frankfurter & N. Greene, The Labor Injunction, 17-18 (1930) (describing the efficacy of enjoining strikes). Employers often selected a federal forum because they expected a more sympathetic hearing before a federal judge. Insulated by life tenure[4] from the sway of public opinion, federal judges tended to be more hostile to labor than state court judges. See Hardin, at 8.
 
 
 15
 Prior to the Norris-LaGuardia Act, the Supreme Court's construction of the federal antitrust laws ensured that federal courts had jurisdiction over labor disputes. In Loewe, the Court interpreted the Sherman Act's prohibition on restraints of trade as applying to the activities of labor unions. See 208 U.S. at 292-93 (holding that a union violated the Sherman Act if the employees' concerted action obstructed the flow of an employer's product in interstate commerce). Congress amended the Sherman Act in 1914 to exempt labor from the federal antitrust laws, see Clayton ActS 6, ch. 323, 38 Stat. 730 (1914) (current version at 15 U.S.C. S 17 (1997)), but the Court limited the Clayton Act's labor exemption to only a narrow category of labor disputes, see Duplex Printing Press Co., 254 U.S. at 469. Drawing a distinction between "primary activity" in which union pressure was directed against an employee's own employer and "secondary activity " in which union pressure was directed against third parties, the Court held that the Clayton Act exempted only primary activity. See id. The Court reached this conclusion even though "[t]he language of the Clayton Act was broad enough to encompass all peaceful strike activity, whether directed at the primary employer or at neutral `secondary' employers. " Bhd. of Maintenance Way Employees, 481 U.S. at 438; see also Jacksonville Bulk Terminals, 457 U.S. at 712 (stating that the Court in Duplex Printing "unduly restricted the Clayton Act's labor exemption").[5]
 
 
 16
 The era of "government by injunction" ended with Congress's enactment of the Norris-LaGuardia Act in 1932. "The underlying aim of the Norris-LaGuardia Act was to restore the broad purpose which Congress thought it had formulated in the Clayton Act but which was frustrated, so Congress believed, by unduly restrictive judicial construction." United States v. Hutcheson, 312 U.S. 219, 235-36 (1941). The plain words of the statute -that a labor dispute does not depend on "whether or not the disputants stand in the proximate relation of employer and employee," 29 U.S.C. S 113(c) -"reflects Congress' decision to abolish . . . the distinction between primary activity between the immediate disputants and secondary activity." Bhd. of Maintenance Way Employees, 481 U.S. at 439 (internal quotation marks and citations omitted). Congress made some secondary boycotts by unions unlawful in 1947 when it passed the Taft-Hartley Act but, significantly, did not restore a private right of action in the federal courts for injunctive relief. See 29 U.S.C. S 158(b)(4) (declaring a secondary boycott to be an unfair labor practice); 29 U.S.C. S 160(j) (giving federal courts jurisdiction to grant injunctive relief to restrain unfair labor practicesonly in cases brought by the National Labor Relations Board).
 
 
 17
 In passing the Norris-LaGuardia Act, Congress described federal labor injunctions unequivocally as" `abuses of judicial power.' " Milk Wagon Drivers' Union, 311 U.S. at 102 (quoting S. Rep. No. 163, 72nd Cong., 1st Sess., p. 8; and H. Rep. No. 669, 72nd Cong., 1st Sess., pp. 7-8). Instead of amending the statutes governing substantive legal rights, on which federal labor injunctions were predicated, Congress simply took from federal courts the power to enjoin labor disputes. Put plainly, Congress resorted to the "extraordinary remedy" of jurisdiction-stripping to prevent the federal courts from using their powers to weaken unions and cripple striking workers. Cf. Bhd. of Maintenance Way Employees , 481 U.S. at 438 (describing Norris-LaGuardia as "respond[ing] directly to the construction of the Clayton Act in Duplex Printing, and to the pattern of injunctions entered by federal judges"). This history guides our decision today.
 
 C
 
 18
 We now turn to the case law. The Supreme Court has consistently characterized Norris-LaGuardia's definition of "labor dispute" as "broad." See, e.g., Bhd. of Maintenance Way Employees, 481 U.S. at 441 ("Congress made the definition of `labor dispute' broad because it wanted it to be broad"); Jacksonville Bulk Terminals, 457 U.S. at 712 ("Congress deliberately included a broad definition [of labor disputes] to overrule judicial decisions that had unduly restricted the Clayton Act's labor exemption from the antitrust laws"); see also Camping Constr. Co. v. District Council, 915 F.2d 1333, 1342 (9th Cir. 1990) (describing the term "labor dispute" as "extraordinarily broad"). Equally expansive is the test that the Supreme Court fashioned for determining whether a particular controversy is a labor dispute. Simply, " `the employer-employee relationship [must be at] the matrix of the controversy.' " Jacksonville Bulk Terminals, 457 U.S. at 712 (quoting Columbia River Packers Ass'n v. Hinton, 315 U.S. 143, 147 (1942)).[6]
 
 
 19
 It is clear that "the matrix " of Local 174's dispute with Burlington Northern is "the employer-employee relationship." Members of Local 174 lost their jobs because Burlington Northern transferred their work to a subcontractor who did not re-hire them and who signed a collective bargaining agreement with a different union.[7] Local 174 feared that Burlington Northern would terminate other subcontracts under which its members worked, leading to more job losses and causing wages and working conditions to deteriorate.[8] Local 174 asked Burlington Northern to guarantee that this process would not occur, but Burlington Northern refused. In short, this dispute is about who will perform work at Burlington Northern's Seattle hub, which union will represent the employees of Burlington Northern's subcontractors, and what will be the terms of their employment.
 
 
 20
 Specific Supreme Court decisions regarding disputes about who will perform particular work compel us to conclude that Norris-LaGuardia applies. To begin, a dispute over an employer's hiring decisions is a Norris-LaGuardia labor dispute. In New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552 (1938), the New Negro Alliance ("NNA") picketed a grocery store to force it to hire African-Americans. The NNA was not a labor union, it did not seek to represent any employees, and its members did not work for the grocery store. See id. at 562. The Court held that Norris-LaGuardia barred injunctive relief because the Act "embrace[d] controversies other than those between employers and employees; between labor unions seeking to represent employees and employers; and between persons seeking employment and employers." Id. at 560-61. The dispute in New Negro Alliance is analogous to the instant dispute: just as the NNA aimed to force the targeted grocery store to hire African-Americans, Local 174 seeks to ensure that Burlington Northern's subcontractors will continue to employ Local 174's members.
 
 
 21
 Local 174 does not lose Norris-LaGuardia's protection because Burlington Northern's contracting policy, rather than its hiring policy, is the crux of the dispute. Local 174's threatened picket line at Burlington Northern's Seattle hub is a classic secondary boycott.[9] By exerting pressure on Burlington Northern, Local 174 hopes to compel Burlington Northern's subcontractors to sign collective bargaining agreements with Local 174. It is well-settled that Norris-LaGuardia's definition of a labor dispute encompasses disputes between a union and a party that does not employ the union's members. See Bhd. of Maintenance Way Employees, 481 U.S. at 442-43 (secondary picketing against nonemployer railroads by union is a Norris-LaGuardia labor dispute); see also Smith's Management, 737 F.2d at 789 (holding that a union boycott of a lessee of a shopping plaza because the shopping plaza hired a nonunion electrical subcontractor was a labor dispute). Indeed, Congress's explicit intentions in passing the NorrisLaGuardia Act were to reverse the primary-secondary distinction drawn by the Court in its interpretation of the Clayton Act and to protect union pressure on secondary targets from federal injunctions. See Bhd. of Maintenance Way Employees, 481 U.S. at 438-39. Thus, attaching significance to the fact that Local 174 challenges Burlington Northern's contracting policy, instead of Parsec's hiring policy, would undermine Congress's purpose and fly in the face of Supreme Court and Ninth Circuit precedent.
 
 
 22
 Moreover, the Supreme Court held in Milk Wagon Drivers' Union that Norris-LaGuardia's jurisdictional bar applies to a dispute between a union and an employer over the employer's contracts with third parties. In that case, the union contended that the third party contracts took work away from its members. See 311 U.S. at 99. The dispute before us is almost indistinguishable from the dispute in Milk Wagon Drivers' Union.[10]
 
 
 23
 In Milk Wagon Drivers' Union, the union represented dairy employees who delivered milk to retailers. During the Depression, some dairies replaced their employees with "vendors" who operated as independent contractors.[11] After the union began picketing, the vendors joined a rival union. Although the union purportedly sought to organize the vendors into their union, it also explicitly demanded that the vendor system be abolished:Whether rightly or wrongly, the defendant union believes that the "vendor" system was a scheme or device utilized for the purpose of escaping the pay ment of union wages and the assumption of working conditions commensurate with union standards. . . . [T]o say, further, that the conditioned abandonment of the vendor system, under the circumstance, was an issue unrelated to labor's effort to improve work ing conditions, is to shut one's eyes to the everyday elements of industrial strife.
 
 
 24
 Id. at 98-99. The demand made by the Milk Wagon Drivers' Union that the vendor system be abolished is akin to Local 174's demand that Burlington Northern subcontract loading and unloading work to subcontractors that have collective bargaining agreements with Local 174. What motivates each demand is a union's desire to protect its members' jobs from replacement by third party contractors.[12] Cf. Order of R.R. Telegraphers v. Chicago N.W. Ry., 362 U.S. 330, 336 (1960) ("[I]n the collective bargaining world today there is nothing strange about agreements that affect the permanency of employment.").
 
 
 25
 Finally, two cases in which the Court decided that NorrisLaGuardia did not bar federal injunctive jurisdiction also persuade us that Local 174's dispute with Burlington Northern is a labor dispute. In Columbia River Packers Ass'n , a union of independent fishermen agreed to sell fish only to canneries that agreed to purchase fish from union members. The union instituted a boycott against a non-compliant fish cannery. Describing the fishermen as "independent entrepreneurs," the Court held that the dispute was "over the sale of commodities" and thus, that the "employer-employee relationship has no bearing on this controversy." 315 U.S. at 146. The second case, Bakery Sales Drivers, Local Union No. 33 v. Wagshal, 333 U.S. 437 (1948), involved a dispute between a bakery and a deli over the hour that the bakery would deliver bread to the deli and the deli's method of paying for the delivery. The union, which represented the bakery's drivers, boycotted the deli because, after failing to settle the dispute, the deli transferred its business to a nonunion bakery. The Court held that Norris-LaGuardia did not apply because the dispute was a "business controversy," not a labor dispute. Id. at 444.
 
 
 26
 It is clear that Local 174's dispute with Burlington Northern is not excluded fromNorris-LaGuardia's protection under Columbia River Packers Ass'n and Wagshal. Local 174's members are not "independent entrepreneurs " selling "commodities." They are employees of Burlington Northern's subcontractors and sell only their own labor. Nor can we characterize Local 174's dispute with Burlington Northern as a "business controversy." Local 174 seeks to influence Burlington Northern's selection of subcontractors only when that selection determines if, and under what conditions, Local 174's members will perform loading and unloading work at Burlington Northern's Seattle hub. A business controversy may exist between Eagle and Burlington Northern over the terms of their subcontracting agreement. But Local 174 has not taken Eagle's side in that dispute because Local 174 never demanded that Burlington Northern retain Eagle as its subcontractor. Unlike the union in Wagshal, Local 174 has not inserted itself into a dispute between two businesses that has only an incidental effect on its members. It has picked a fight with Burlington Northern because Burlington Northern's contracting decisions determine whether Local 174's members will work at Burlington Northern's Seattle hub. In short, "the matrix of the dispute" between Local 174 and Burlington Northern is protecting the "employer-employee relationship" between Local 174's members and Burlington Northern's existing subcontractors and creating an "employer-employee relationship" with any future subcontractors of Burlington Northern.
 
 III
 
 27
 Even if a dispute is a labor dispute under NorrisLaGuardia, a federal court may issue an injunction (1) under the Norris-LaGuardia Act's "unlawful acts" exception, see 29 U.S.C. S 107; or (2) if the Railway Labor Act ("RLA") provides the procedure for resolving the dispute. See Federal Express, 617 F.2d at 526 (citing Bhd. of R.R. Trainmen v. Chicago R. & I. R. Co., 353 U.S. 30, 42 (1957)). Burlington Northern conceded at oral argument, and we agree, that the district court did not have jurisdiction under the "unlawful acts" exception because the statutory requirements for issuing an injunction had not been satisfied. See 29 U.S.C. SS 104, 107, 108. Burlington Northern does argue, however, that the district court had jurisdiction to issue an injunction under the RLA. We disagree.
 
 
 28
 The RLA does not give the district court jurisdiction over this case because the RLA regulates only disputes between primary employers and employees. See Federal Express, 617 F.2d at 526 (stating that the "RLA mechanisms relate to disputes between employers and employees"); 45 U.S.C. S 151 Fifth (defining the term "employee" to include "every person in the service of a carrier . . . who performs any work defined as that of an employee or subordinate official in the orders of the Interstate Commerce Commission now in effect"); 45 U.S.C. S 157 (setting out procedures for resolving controversies "between a carrier or carriers and its or their employees"). Burlington Northern is not a primary employer in this dispute because it subcontracts the loading and unloading work previously performed by Local 174's members to third-party contractors.
 
 IV
 
 29
 We vacate the district court's grant of preliminary injunctive relief and remand to the district court with instructions to dismiss for lack of jurisdiction.
 
 
 30
 VACATED AND REMANDED.
 
 
 
 Notes:
 
 
 [1]
 Burlington Northern also named as defendants two officers of Local 174, Robert Hasegawa and Eric Smith.
 
 
 [2]
 In addition to filing suit in federal court, Burlington Northen filed an unfair labor practice charge with the National Labor Relations Board ("NLRB"), contending that Local 174's threatened picketing constituted an unlawful secondary boycott under 29 U.S.C. S 158(b)(4)(A) and (B). The NLRB dismissed the charge, and its Office of Appeals affirmed the dismissal.
 
 
 [3]
 The only issue before us is whether the district court had jurisdiction to enjoin the threatened picketing. We do not reach the question whether the antitrust laws are implicated.
 
 
 [4]
 See U.S. Const. art. III,S 1.
 
 
 [5]
 Section 6 of the Clayton Act reads:
 The labor of a human being is not a commodity or article of com merce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or hor ticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objectives thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade under the antitrust laws.
 15 U.S.C. S 17.
 U.S. at 712 (holding that union's refusal to unload goods shipped from the Soviet Union in protest of the Soviet invasion of Afghanistan was a "labor dispute"); Marine Cooks & Stewards v. Panama Steamship Co., 62 U.S. 365, 370 (1960) (holding that union dispute with foreign ship over substandard wages and working conditions of employees of foreign employer is a Norris-LaGuardia labor dispute); Order of R.R. Telegraphers v. Chicago N.W. Ry., 362 U.S. 330, 335 (1960) (holding that a union's demand that no existing position be abolished except by agreement between employer and union is a "labor dispute" under Norris-LaGuardia); Hutcheson, 312 U.S. at 234-35 (holding that jurisdictional dispute between two unions is a labor dispute); Milk Wagon Drivers' Union, 311 U.S. at 103 (finding that a dispute between a union and an employer over the employer's use of independent vendors is a labor dispute); New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 562 (1938) (holding that a dispute between an employer and a nonlabor organization over racial discrimination in hiring is a labor dispute).
 
 
 [6]
 Owing to this broad definition, the Supreme Court has found the term "labor dispute" to capture a wide range of controversies. See, e.g., Bhd. of Maintenance Way Employees, 481 U.S. at 441-42 (holding that NorrisLaGuardia prevents injunctions against union picketing of terminals through which employer's trains ran); Jacksonville Bulk Terminals, 457
 
 
 [7]
 At oral argument, counsel for Local 174 stated that the union representing Parsec's employees is not affiliated with the AFL-CIO and that Local 174 has filed a charge with the National Labor Relations Board, contending that Parsec has unlawfully recognized a company union in violation of 29 U.S.C. S 158(a)(2).
 
 
 [8]
 It is widely recognized among scholars, practitioners, and policymakers that client companies, such as Burlington Northern, are able to frustrate the efforts of employees to improve their wages and working conditions through collective bargaining by subcontracting work to thirdparty contractors. See, e.g., Commission on the Future of WorkerManagement Relations, Report and Recommendations (December 1994) (established by the United States Departments of Labor and Commerce) (stating that contingent workers, a category that includes employees of subcontractors, often receive lower pay and benefits than traditional workers and are less likely to benefit from labor and employment law protections); Craig Becker, Labor Law Outside the Employment Relation, 74 TEX. L. REV. 1527, 1532-35 (1996) (stating that subcontracting "enables the client company to create a virtually continuous bidding process . . . [that] exerts constant downward pressure on the wages of subcontractors' employees" and to "thwart workers' efforts to achieve labor representation, secure binding contracts, and reap the benefits of informal commitments made by employers"); Jonathan P. Hiatt, Policy Issues Concerning the Contingent Workforce, 52 WASH. & LEE L. REV. 739, 745 (1995) (describing how subcontracting agreements impede employees' attempts to bargain collectively); Jonathan P. Hiatt and Lee W. Jackson, Policy Issues Concerning the Contingent Workforce, 12 L AB. LAW. 165, 178-79 (1996) (discussing how the National Labor Relations Act might be reformed to enable employees of subcontractors to engage in effective collective bargaining); Jennifer Middleton, Contingent Workers in a Changing Economy: Endure, Adapt, or Organize?, 22 N.Y.U. REV. L. & SOC. CHANGE 557, 595-96 (1996) (describing how client companies use the process of competitive bidding to control wage and benefit levels); Walter V. Siebert and N. Dawn Webber, Joint Employer, Single Employer, and Alter Ego, 3 LAB. LAW. 873 (Fall 1987) (advising companies how to structure subcontracting arrangements to avoid being deemed an employer under the NLRA); Eileen Silverstein and Peter Goselin, Intentionally Impermanent Employment and the Paradox of Productivity, 26 STETSON L. REV. 1, 2 (1996) (asserting that contingent employees earn lower wages and benefits and have less job security than permanent employees); cf. Stephen F. Belfort, Labor Law and the Double-Breasted Employer: A Critique of the Single Employer and the Alter Ego Doctrine and a Proposed Reformulation, 1987 WIS. L. REV . 67 (1987) (explaining how the practice of double-breasting enables employers to divert work to the nonunion sector and to pressure unionized workers to grant wage concessions).
 
 
 [9]
 The question whether the secondary boycott violates federal labor law is not before us. See 29 U.S.C. S 160(j) (giving federal courts jurisdiction to grant injunctive relief to restrain unfair labor practices only in cases brought by the National Labor Relations Board).
 
 
 [10]
 What distinguishes this case from Milk Wagon Drivers' Union is that Local 174 has disavowed any interest in representing the Parsec employees, presumably because another union already represents them. However, Norris-LaGuardia encompasses a dispute between a union and an employer in which the union does not represent or seek to represent the employees. See Marine Cooks, 362 U.S. at 370 (union picketed foreign ship that paid substandard wages to foreign workers); New Negro Alliance, 303 U.S. at 560-61 (discussed in detail above); Federal Express Corp. v. Teamsters Local 85, 617 F.2d 524 (9th Cir. 1980) (holding that "the provisions of the Norris-LaGuardia Act plainly apply even if the union does not purport to represent any employees"). While Local 174 disclaims any interest in representing the present Parsec employees, Local 174 does wish to continue representing the employees of other current subcontractors and to represent the employees of any subcontractors to whom Burlington Northern transfers work in the future. Moreover, even if Local 174 did seek to represent the Parsec employees, Local 174 and Burlington Northern would still be engaged in a labor dispute. See Hutcheson, 312 U.S. at 234-35; Milk Wagon Drivers' Union, 311 U.S. at 99.
 
 
 [11]
 Although the Court in Milk Wagon Drivers' Union did not decide whether the vendors were independent contractors, the facts suggest that they were. The vendors owned their own trucks, paid their own expenses, and earned a commission based on the amount of milk sold. See 311 U.S. at 126 n.11.
 
 
 [12]
 Burlington Northern attempts to distinguish Milk Wagon Drivers' Union on the ground that Local 174 has not developed a record showing that Parsec employees earn lower wages and benefits than are provided for under Local 174's collective bargaining agreement. This distinction is irrelevant. Local 174's dispute with Burlington Northern would still be a labor dispute even if Parsec paid equivalent or higher wages and benefits than Local 174 has achieved in its contract. Unions serve not only to obtain immediate improvements in wages and benefits, but also to provide job security to their members and to protect against wage and benefit deterioration in the future. Thus, Burlington Northern's position -that a union can have no legitimate interest, as a labor union, in challenging a client company's subcontracting decision unless that decision has caused an immediate decline in wages and benefits -is incorrect.
 Similarly, Burlington Northern insists that what Local 174 really wants is an anticompetitive lock on the jobs at Burlington Northern's Seattle hub. It argues that the agreement that it demanded from Burlington Northern would be unlawful under Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616 (1974). Burlington Northern's reliance on Connell is misplaced, but revealing. Boiled down, Burlington Northern's argument is that Norris-LaGuardia does not apply because Local 174 demanded that Burlington Northern sign an agreement that would violate antitrust law. This argument lacks merit because the Norris-LaGuardia Act bars injunctive relief in labor disputes even when the union's actions violate the antitrust laws. See Bhd. of Maintenance Way Employees, 481 U.S. at 429 n.3; Order of R.R. Telegraphers, 362 U.S. at 341 n.15; Milk Wagon Drivers' Union, 311 U.S. at 103.